JOHN PFOMER, plaintiff in error, v. THE PEOPLE, defendants in error.

Where, on a trial for murder, the court, in charging the jury, submitted to them to decide whether the prisoner was guilty of murder or manslaughter, or whether the act in question was justifiable homicide, and after an absence of twenty-four hours, the jury, not having agreed, returned into court and asked .for further instructions on the law, when the court further charged the jury that if they believed the witnesses, the case was clearly within one of the degrees of manslaughter, and it was for the jury to say which degree, such further charge was held to be erroneous, as withdrawing from the jury the decision of questions of fact.

In such a case it is purely a question of fact for the jury to determine whether the prisoner, at the time he slew the deceased, had reasonable ground to believe his own life to be in danger from the deceased.

Where a case rests upon circumstances, it is for the jury to construe them and to say whether they necessarily impute guilt to the defendant, or whether they are consistent with his innocence.

On a trial for murder, where the death occurred in a personal encounter, and the defence is that the killing was justifiable, on the ground that the prisoner, at the time he slew the deceased, had reasonable ground to believe his own life to be in danger, whether it is competent for the prisoner to prove the violent and ruffianly character and habits of the deceased, and whether such character and habits must be brought to the knowledge of the prisoner, discussed by counsel, with a full collection of the American authorities on these questions.

·THIS case came before the court on writ of error. By the return, it appeared that in April, one thousand eight hundred and fifty-nine, an indictment in the following form was found against the defendant in the New York General Sessions:

*City and County of New York, ss :*

The Jurors of the People of the State of New York, in and for the body of the city and county of New York, upon their oath, present:

That John D. Pfomer, late of the first ward of the city of New York, in the county of New York, aforesaid, on the

Pfomer *v.* The People.

twenty-fifth day of March, in the year of our Lord one thousand eight hunered and fifty-nine, at the ward, city and county aforesaid, with force and arms, in and upon one Charles Sturgis, in the peace of the people of the State, then and there being, willfully and feloniously did make an assault.

And that the said John D. Pfomer, a certain pistol then and there loaded with gunpowder and one leaden bullet, which he, the said John D. Pfomer, in his right hand then and there had and held, then and there willfully and feloniously, did shoot off and discharge, at and against him, the said Charles Sturgis, and at and against the right side of the chest of him, the said Charles Sturgis, giving unto the said Charles Sturgis, then and there with the leaden bullet aforesaid, so shot off and discharged as aforesaid, out of the pistol aforesaid, so loaded as aforesaid, in and upon the right side of the chest of him, the said Charles Sturgis, one mortal wound, of the breadth of one inch and of the depth of five inches, of which said mortal wound he, the said Charles Sturgis, at the ward, city and county aforesaid, from the said twenty-fifth day of March, in the year aforesaid, until the twenty-seventh day of March, in the same year aforesaid, did languish, and languishing did live, and on which twenty-seventh day of March, in the year aforesaid, the said Charles Sturgis, at the ward, city and county aforesaid, of the said mortal wound did die.

And so the jurors aforesaid, upon their oath aforesaid, do say that he, the said John D. Pfomer, the said Charles Sturgis, in the manner and form, and by the means aforesaid, at the ward, city and county aforesaid, on the day and the year aforesaid, willfully and feloniously did kill and slay, against the form of the statute in such case made and provided, and against the peace of the People of the State of New York, and their dignity.

NELSON J. WATEBBURY,<br>
*District Attorney.*

On the 19th day of April, 1859, the defendant was arraigned on said indictment, in said Court of General Sessions, and

pleaded not guilty. This indictment was subsequently re-moved into the Court of Oyer and Terminer in and for the city of New York. The issue so joined came on to be tried on the 26th day of April, 1859, before Mr. Justice Davies, of the Supreme Court, and a jury duly impanneled to try said issue.

The prosecution called as a witness,

· *Frederick Schwitzgebele*, who, after being duly sworn, testified as follows: I live at No. 78 Forsyth street; I know Pfomer, the prisoner, and Charles Sturgis, the deceased; the prisoner, is a baker; he was my partner; we did business at No. 36 Bowery, in the basement; kept coffee, cakes and oysters; we kept open from five o'clock in the afternoon till five o'clock in the morning; I was there Thursday night and Friday morn-ing, the 24th and 25th of March last; the prisoner was there; I got there in the afternoon of Thursday, and staid till this happened; I saw Sturgis (the deceased) there; he came there about half-past twelve Friday morning; several young men there when he came in; there were three or four customers there; the servant girl, Fanny M. Carter, and a boy named Vincent were there; he came out of the kitchen; it is neces-sary to pass through the saloon to get into the kitchen; when Sturgis and his friend, Kerrigan, first came down into the saloon, they were skylarking—that is, fooling and pushing one another; at the same time I was attending to the customers; a customer came to the bar and paid nine cents for what he had; I was busy, and Sturgis leaned over the bar and opened the till; the man had a ten cent piece; Sturgis took out a penny and gave it to him; I don't know what became of the ten cent piece; Sturgis asked one of the three or four customers to treat; one of them said "Yes;" he asked his friend Kerrigan if he would drink, and he said "Yes, he would have a glass of porter;" Sturgis drank once; he then turned round and picked up a sugar bowl, and tossed it up, and spilled all the sugar out of it, and I told him to hold on, and put it down, and he did so; after that Sturgis went toward the kitchen; the kitchen door was bolted; he looked over the partition, and told

Pfomer *v.* The People.

the girl who was in the kitchen to open the door; the girl was in the kitchen; the girl would not open it at first; Sturgis kept pulling at the door, and said he would break it if she did not open it; she then opened the door, and Sturgis went into the kitchen; he was there five or ten minutes; the defendant afterwards came out of the kitchen, and Sturgis after him; I then called Sturgis up to drink the rest of his beer; he had not finished it; it was standing on the bar; he took off his hat and coat, and went into the kitchen again, in his shirt sleeves; he was in the kitchen about five minutes; I heard him speaking loud to the defendant; both were speaking loud; I heard defendant tell him to go away from there; I told Kerrigan to go in and get his friend out; when Kerrigan went to the kitchen door, the pistol went off; Sturgis came out of the kitchen, and said, "I am shot;" that is all I heard; Sturgis was taken away; he was wounded in the breast.

*Cross-examination:* The prisoner's business was to bake the cakes and prepare coffee in that kitchen; he was there every night; the servant woman was there to aid him; customers were not allowed in the kitchen, though they went in sometimes; the saloon is the only public part of the premises; there is a store-room back of the kitchen; the defendant was in the kitchen at work baking cakes for the customers that night, when Sturgis came there.

*Re-direct examination:* Sturgis was in liquor that night; he generally came in every evening; he generally conducted himself quietly, and did no harm when he came in early in the evening; I never saw the deceased do anything out of the way in my life; I have known him a long while; he was in the habit of coming in our saloon almost every night for supper; I have been in that saloon several years, and was almost always in whenever the deceased and his friends came for supper; I never saw him commit any act of violence, or do anything wrong.

*Fanny McCarty* was then called on behalf of the prosecution, and, after being duly sworn, testified as follows: I live at No. 36 Bowery; I know the defendant and Sturgis (the de-

ceased); I saw him in the saloon every night; I was in the employ of the defendant and his partner; Sturgis' had his supper there that night; I was there at the time Sturgis was shot, and received some of the powder in my face; I was in the kitchen; Sturgis came there early in the night, and had his supper with a man with one eye; they both went out; they were very fond of swearing; they came back between twelve and one o'clock; Sturgis put his hand over the top of the partition, and said if the door was not opened he would throw it in; the door was fastened on the inside; I stood by the door, and said I would open the door, and did open it; he said he wanted to get in to lick the baker (the defendant); the defendant was standing at the table inside making cakes; he fisting the defendant in a silly way, the defendant told him to go away, that he wanted nothing to do with him; the defendant said, waving both hands, "Go away, go away,"—to go out of the kitchen into the saloon; he did so, and shut the door of the kitchen; Sturgis remained out three or four minutes, and came right back again, and said, "I want to lick no man but the baker" (defendant), and took hold of defendant; defendant pulled away from him, and told him to let him go, to go right back into the saloon; defendant went back into the store-room, a recess, and took a pistol; defendant told him to go away, that he wanted nothing to do with him; Sturgis did not go; the defendant took the pistol and said, "Now, will you stand back?" he cocked the pistol at him and fired; Sturgis did not stand back; Sturgis had nothing in his hand; Sturgis, when he asked to open the door, cursed out; after defendant put Sturgis out of the kitchen, he shut the door; it was not fastened; Sturgis stood still, just as if he was not afraid of anything; Sturgis followed the prisoner into the recess; defendant walked pretty quick to get the pistol; defendant told him in an angry manner to stand back; Sturgis rubbed his breast, and said he was shot or killed, and staggered round, and went out into the saloon, where he threw up blood; I don't remember seeing Sturgis in the kitchen before; I have seen two or three young fellows come into the kitchen twice or

Pfomer *v.* The People.

three times; Frederick Vincent was in the kitchen at the time; I saw the body of Sturgis at the City Hospital on Monday or Tuesday after that; he was dead then.

*Cross-examination:* Sturgis hit defendant just as if he wanted to get him in a passion; Sturgis followed the defendant into the store-room when defendant went in to get the pistol; no door to the store-room, except the entrance from the kitchen; defendant said in the store-room to Sturgis, "Now, will you stand back?" he did not stand back, and he fired at him; Sturgis was not in the store-room at all; he stood at the door when he was shot.

*Timothy Donnovan,* called for the prosecution, and after being duly sworn, testified as follows: I never saw defendant before to-day; I know the saloon 36 Bowery; I and Seagrist were in there that night, fifteen or eighteen minutes, and left after twelve o'clock; defendant waited on me at the table; Sturgis came in with Kerrigan; Sturgis and Kerrigan were skylarking; then a boy about seventeen years old treated Sturgis; Sturgis skylarked with the person who treated him, and with the prisoner; Sturgis got into the kitchen very easy; he did not at the first, but did the second time, put his hand on the partition; the prisoner looked very mad—angry; Sturgis came out himself; I think defendant did not come out with him; Sturgis came out and carried on again, full of fun; Sturgis laughingly said he could lick any man in the house but the baker; did not hear him curse or swear at all; he, Sturgis, went in there, and heard a pistol; all still in there; door not shut, and could hear.

*Cross-examination:* I did not know either party; I was about thirty feet from the kitchen door; I was examined before the coroner's inquest, and I testified as I now do; I am certain Sturgis went into the kitchen twice; Sturgis was in fifteen or twenty minutes before he went into the kitchen; I did not testify on the inquest that Sturgis came in, and went right through into the kitchen.

Officer *William J. Williams* was then called on behalf of the prosecution, and after being duly sworn, testified: Heard of

this two or three minutes after it happened; went into saloon; I saw the deceased in the saloon; he was on his hands and knees; I asked him what was the matter, and he said he was shot; officer Holmes and I put him in a coach, and took him to the New York Hospital, and left him there.

*Dr. Joseph J. Hall,* called by prosecution, and after being duly sworn, testified as follows: I am physician at New York Hospital; I was at the hospital the night deceased was brought there; his name was Sturgis; this was the only one brought; he had two wounds on the right side of his chest, made by two balls; I afterwards pointed this body out to Dr. Quimby, it was Saturday afternoon.

*Dr. George A. Quimby* was then called on behalf of the prosecution, and after being duly sworn, testified as follows: Is a physician at New York Hospital; I received this body from the last witness; the two wounds caused his death; he died on the Sunday afternoon after he came in.

*Frederick Vincent* was then called for the prosecution, and, after being duly sworn, testified as follows: I know the defendant and the deceased; were at the saloon that night; the deceased got there about twelve o'clock that night; there were three or four customers there; the girl and the defendant were in the kitchen; I went in there; I was there when the deceased came in; Sturgis talked to the customers, took off his coat, and washed himself; Sturgis went to the door and knocked on it, and the girl opened it for him; he went in, and began to fool with the baker; he only said, "Open the door;" he did not curse or swear; he had hold of defendant by the wrist, and both went into the saloon; Sturgis went and drank his beer, and the defendant went back to the kitchen; when he had half drinked his beer, he said, "Let us have some more fun with the baker;" Sturgis then went into the kitchen; defendant fired at Sturgis; one cap missed, and the second time shot him; shot him when deceased was three or four steps in the kitchen; the prisoner stood in the door of the store-room when he shot; I did not hear deceased and defendant say anything; I ran out.

Pfomer *v.* The People.

*Cross-examination:* I have known Sturgis eight or nine years; I am very friendly with him.

The prosecution here rested the case.

The defendant's counsel thereupon called *John Ploth*, as a witness on behalf of the defence, who, after being duly sworn, testified as follows: I keep a saloon at 37½ Bowery; I know Sturgis, the deceased; I have known him for a long time; I have also known the prisoner for a considerable time.

The court here asked the counsel for the prisoner what he intended to prove by this witness.

Defendant's counsel thereupon offered to prove by this witness (at the same time stating to the court that he intended to call numerous other witnesses to the same facts), that the deceased was addicted to rowdy and ruffianly habits; that he was in the constant practice of perpetrating gross and unprovoked acts of violence upon the persons and property of peaceful and unoffending citizens; that, without any cause or provocation, he was in the habit of using knives and pistols upon persons with whom he came in contact, thereby subjecting to imminent danger the lives of such persons; that it was the constant practice of the deceased to carry deadly weapons concealed about his person. The court refused to allow the above-mentioned facts, or any of them, to be given in evidence, unless it was coupled with the offer to show that the same was or were known to the prisoner; to which decision the counsel for the prisoner then and there duly excepted.

The counsel for the prisoner thereupon proposed to prove by this witness that the deceased was in the habit of committing violent assaults with knives and pistols upon the proprietors of restaurants, like that kept by the prisoner; and that deceased was in the habit of maliciously and wantonly destroying the property in such restaurants, and beating the inmates in such restaurants. The court refused to allow the evidence, or any part thereof to be given; to which refusal the counsel for the prisoner then and there duly excepted.

The counsel for the defendant thereupon proposed to prove by this witness, that the deceased, on the night of the homicide

in question, had maliciously destroyed the property in the restaurant kept by the witness, at No. 37½ Bowery, in said city, and that the deceased had committed gross and unprovoked acts of violence upon persons whom he met in said restaurant. The court refused to allow this evidence to be given ; to which decision the counsel for the prisoner then and there duly excepted.

It was conceded by the prosecution that the defendant was a person of good character, for integrity, peace and quietness. The cause was summed up to the jury by the counsel for the prisoner and prosecution, respectively.

The court then proceeded to charge the jury, and, among other things, charged : "That if the jury believed the testimony of the witnesses, the prisoner was guilty of the crime of murder or manslaughter, if the act of taking the deceased's life was not justifiable or excusable homicide." (The judge then explained the provisions of the statute in reference to justifiable and excusable homicide, and the crimes of murder and manslaughter.) "That if they (the jury) believed the prisoner was in great danger of loss of life, or of serious personal injury, at the hands of the deceased, and killed him, in that defence of life or person he was justified, otherwise not." To this portion of the charge the counsel for the prisoner then and there duly excepted.

The court thereupon charged the jury, that to justify the taking of life, the danger to the person taking it must be real and imminent. To this portion of the charge the counsel for the prisoner then and there duly excepted.

The jury retired to consider upon the verdict, and after an absence of over twenty-four hours, returned into court and stated that they desired further instructions from the court, but did not specify in what particular. The court instructed the jury, that if they believed the witnesses, the case was clearly within one of the degrees of manslaughter, and it was for the jury to say which degree. To this instruction of the court, the counsel for the prisoner then and there duly excepted. The jury thereupon retired, and after an absence of some ten

Pfomer *v.* The People.

minutes, returned into court and rendered a verdict of guilty of manslaughter in the second degree.

The prisoner was sentenced to four years in the State Prison. Mr. Justice Davies granted a stay of proceedings in the following form indorsed upon the writ of error:

I allow the within writ, and I do direct that the same is to operate as a stay of proceedings on the judgment upon which this writ is brought.

Dated New York, November 16th, 1859.

(Signed)

HENRY E. DAVIES.

*Henry L. Clinton,* for the plaintiff in error.

I. The court below erred in refusing to permit the prisoner to prove the violent and ruffianly character of the deceased.(*a*)

After the prosecution rested, the counsel for the defence called one Ploth as a witness. "The court here asked the counsel for the prisoner what he intended to prove by this witness. Defendant's counsel thereupon offered to prove by this witness (at the same time stating to the court that he intended to call numerous other witnesses to the same facts), that the deceased was addicted to rowdy and ruffianly habits; that he was in the constant practice of perpetrating gross and unprovoked acts of violence upon the person and property of peaceful and unoffending citizens; that without any cause or provocation, he was in the habit of using knives and pistols, upon persons with whom he came in contact, thereby subjecting to imminent danger the lives of such persons; that it was the constant practice of the deceased to carry deadly weapons concealed about his person. The court refused to allow the above mentioned facts, *or any of them,* to be given in evidence, unless it was coupled with the offer to show that the same was or were

(*a*) Though this question was not decided by the court at general term, the reporter considers the arguments of counsel and the full collection of authorities too valuable to the profession to be omitted.

known to the prisoner; to which decision the counsel for the prisoner then and there duly excepted."

1st. The authorities are numerous showing that on the state of facts disclosed by the bill of exceptions, proof of the violent and ruffianly character of the deceased was admissible in evidence.

*Whenever the prisoner has been assaulted, however light the assault, even though not followed by a battery,* the authorities (with the exception of a single *nisi prius* case), are uniform in holding that it is the right of the prisoner to introduce such evidence.

*State* v. *Tackett* (1 *Hawks,* 210), was a case of alleged murder of Daniel, a slave. The prisoner was found guilty. A motion for a new trial was made in the Supreme Court. On the trial, among other things, the prisoner " offered to prove that the deceased was a turbulent man, and that he was insolent and impudent to white people; but the court refused to hear such testimony, unless it would prove that the deceased was insolent and impudent to the prisoner in particular."

The court, per Taylor, C. J., in reference to this point, say: " The conclusion they (the jury) might arrive at, was all important to the prisoner, since the degree of homicide depended on it; and whether it was malicious, extenuated or excusable, must have been determined by them, from such light as they could gather from the facts actually proved, and such inferences as they might deduce from them. It cannot be doubted that the temper and disposition of the deceased, and his usual deportment towards white persons, might have an important bearing on this inquiry, and, according to the aspect in which it was presented to the jury, tend to direct their judgment as to the degree of provocation received by the prisoner. If the general behavior of the deceased was marked with turbulence and insolence, it might, in connection with the threats, quarrels and existing causes of resentment he had against the prisoner, increase the probability that the latter had acted under a strong and legal provocation. If, on the contrary, the behavior of the deceased was usually mild and respectful towards white

Pfomer *v.* The People.

persons, nothing could be added by it to the force of the other circumstances. They must still depend upon their own weight, and the probability be lessened, that the prisoner had received a provocation sufficient, in point of law, to extenuate the homicide. *The evidence, therefore, ought to have been received.*"

In *Queensbury* v. *State* (3 *Stew. & Port.,* 308), the Supreme Court, per Lipscomb, Ch. J., on a motion for a new trial, say: " The circumstances under which this testimony was offered, are not shown by the record with sufficient clearness and distinctness to enable this court to determine whether it ought to have been admitted or not. That the good or bad character of the deceased, as an abstract proposition, can have no influence on the guilt of the accused, is too clear to admit of controversy.

" To murder the vilest and most profligate of the human race, is as much a crime as if he had been the best, the most virtuous, and the greatest benefactor of mankind. But there can be no doubt but that when the killing has been under such circumstances as to create a doubt, the character of the accused may sometimes afford a clue by which the devious ways by which human action is influenced, may be threaded, and the truth attained. It is an acknowledged principle that if, at the time the deadly blow was inflicted, the person who so inflicts has well founded reason to believe himself in imminent peril, without having, by his fault, produced the exigency, that such killing will not be murder.

" If the deceased was known to be quick and deadly in his revenge of imagined insults; that he was ready to raise a deadly weapon on every slight provocation; or, in the language of the counsel, 'his garments were stained with many murders,' when the slayed had been menaced by such an one, he would find some excuse, in one of the strongest impulses of our nature, in anticipating the purposes of his antagonist. The language of the law, in such a case, would be, obey that impulse to self-preservation, even at the hazard of the life of your adversary.

" If the killing took place under circumstances that could afford the slayer no reasonable grounds to believe himself in

peril, he could derive no advantage from the general character of the deceased for turbulence and revenge. But if the circumstances of the killing were such as to leave any doubt whether he had not been more actuated by the principle of self-preservation than that of malice, it would be proper to admit any testimony calculated to illustrate to the jury the motive by which he had been actuated.

" To this course we can see no good objection; and it seems pretty certain that it would often shelter the innocent from the influence of that sound, but not more unfrequently severe, maxim of law, that when the killing has been proven, malice will be presumed, unless explained and rebutted. There can be but little danger of the guilty escaping under the influence of a prejudice created by such testimony against the deceased. The discretion of the judge will be able to control and prevent such a result. And jurors will be able to comprehend the reason and object of such testimony." (*Ib.*, 315, 316.)

In this case the court granted a new trial upon · another point, raised on a challenge to a juror. It did not appear from the exceptions whether the prisoner had been assaulted, and, therefore, the appellate court could not determine whether, upon the trial, the evidence as to the violent character of the deceased should or should not have been admitted; nevertheless, the reasoning of the court, upon the point in question, may be regarded as an adjudication.

In *Monroe* v. *State* (5 *Geo. R.*, 85), the court, upon the trial of the prisoner for murder, refused to allow evidence of the violent character of the deceased to be introduced. The Supreme Court, per Lumpkin, J., on a motion for a new trial, on this, among other grounds, say : " It is further argued that the court erred in rejecting evidence which went to show that the deceased was a violent, rash and bloody-minded man—reckless of human life," &c. * * " As a general rule, it is true, that the slayer can derive no advantage from the character of the deceased for violence, provided the killing took place under circumstances that showed he did not believe himself in danger. *Yet, in cases of doubt, whether the homicide was perpetrated*

Pfomer *v.* The People.

*in malice, or from a principle of self preservation, it is proper to admit any testimony calculated to illustrate to the jury the motive by which the prisoner was actuated.* (3 *Stew. & Port.*, 308.) *And in this view, we think the evidence was improperly ruled out.* Reasonable fear, under our code, repels the conclusion of malice; and has not the character of the deceased for violence much to do in determining the reasonableness or unreasonableness of the fear under which the defendant claims to have acted? Does it make no difference whether one's adversary be a reckless and overbearing bully, having a heart lost to all social ties and order, and fatally bent on mischief, or is a man of Quaker-like mien and deportment? One who never strikes, except in self-defence, and then evincing the utmost reluctance to shed blood? We apprehend that the imminence of the danger, as well as the chances of escape, will depend greatly upon the temper and disposition of one's foe. In these cases, every individual must act upon his own judgment, and in view of his solemn responsibility to the law. * * * Who, knowing the character of Kyd, the pirate, or of the infamous John A. Murrill, would not instantly upon their approach, armed with deadly weapons, act upon the presumption that robbery or murder, or both, were contemplated?"

A new trial was granted on this, among other grounds.

In the case of *Keener* v. *State* (18 *Geo. R.*, 194), it appeared that the homicide was perpetrated in a house of ill-fame. Ill-feeling previously existed between defendant and deceased, as both were rivals for the favors of the landlady. There was evidence going to show that the *deceased assaulted the prisoner*, although it did not appear that the assault was accompanied by a battery. On the trial, testimony was offered to show the violent character of deceased in the place where the homicide occurred. This was ruled out, and exception taken. The Supreme Court held this ruling erroneous. On a motion for a new trial, per Lumpkin, J., in discussing this point, the court say:

"Upon examination, I am satisfied that the questions propounded to Prater were in the proper form. Mr. Greenleaf, in

treating of the rule as to the admissibility of evidence of general character, concludes thus: 'But it seems that the character of the party, in regard to any particular trust, is not in issue, unless it be the trait charged against him.' * * * And the author quotes *Swift's Evidence,* and numerous cases, English and American, to sustain this proposition. (1 *Green. Ev.,* § 55, *n.*)

" The particular trait involved in the issue here, was the character of Mr. Reese for violence in this place; a circumstance relied on by Keener, in part, for his justification in committing the homicide.

" The court repudiate the doctrine 'that a man may not have different general characters, adapted to different circumstances and localities; that is, a character for rail-cars, and a character for the brothel, a character for the church, and one for the street.'" * * * The court proceeds: "Instead of a doctrine like this being too loose for judicial investigation, we hold that it is in accordance with the soundest elementary principles. In *all cases,* where evidence is admitted touching the general character of the party, it ought manifestly, say the authorities, to bear reference to the nature of the charge against him." * * * "As a conductor, Mr. Reese was uniformly gentlemanly; at the brothel, he was menacing, turbulent, rash, reckless and raging." (*Pp.,* 220, 221, 222.)

The judge then quotes the opinion of Lipscombe, C. J., in *Queensbury* v. *State* (3 *Stew. & Port.,* 303), with approbation.

In *Prichett* v. *State* (22 *Ala.,* 39), the prisoner was indicted for murder. The court held that, inasmuch as defendant had not been assaulted, and the killing of deceased by him would be murder, on the testimony, however bad might have been the character of deceased, the court below properly excluded all evidence on that subject. The court recognize the rule laid down in *Queensbury* v. *State* (3 *Stew. & Port.,* 308).

In their opinion, per Chilton, C. J., the court say: "An act performed by a quick, impulsive, blood-thirsty, abandoned man, might afford much stronger evidence that the life of the party assailed was in imminent peril, than if performed by one

Pfomer *v.* The People.

known to possess an entirely different character and disposition, and might very reasonably justify a resort to more prompt measures of self-preservation. In such case, the act and *status* of the actor must be taken together, in order to arrive at a just conclusion respecting its nature. Thus it is, the character of the deceased becomes a legitimate subject of inquiry, as connecting itself with the transaction, which it may serve to explain. But however bad or desperate that character may be, and however many threats such person may have made, he forfeits no right to his life, until by an actual attempt to execute his threats, or by some act or demonstration at the time of killing, taken in connection with such character or threats, he induces a reasonable belief, on the part of the slayer, that it is necessary to deprive him of life, in order to save his own, or to prevent some felony upon his person."

In *Franklin* v. *State*, 29 *Ala.*, 14), defendant was convicted of the murder of his brother.. The court, on the trial, refused to allow evidence of the violent character of deceased. The court, per Walker, J., after quoting with approbation cases of *Queensbury* v. *State* (3 *Stew. & Port.*, 308), and *Pritchett* v. *State* (22 *Ala.*, 39), say: "It seems to result as a sequence from this principle, that the character of the deceased for turbulence, violence, revengefulness, bloodshed and the like, where it qualifies, explains and gives meaning and point to the conduct of the deceased, should be proper evidence. Conduct of a man of peaceable character and harmless deportment, might pass by without exciting a reasonable apprehension of imminent peril; while, on the other hand, the same conduct from a man of notoriously opposite character and habits, might reasonably produce a consciousness of the most imminent peril, and a conviction of the necessity of prompt defensive action. Whenever such bad character on the part of the deceased thus illustrates the circumstances attending a homicide, and the circumstances, so illustrated, tend to produce a reasonable belief of imminent danger in the mind of the slayer, the character, as mingled with the transaction, is a part of it, and is indispensable to its correct understanding. Such we understand to

be in effect the decisions in Queensbury's and Pritchett's case. (*Pp.* 17, 18.)       *       *       *       *       *       *

"When the conduct of the deceased, although in itself innocent, is such that, illustrated by his character, its tendency is to excite a reasonable belief of imminent peril, the evidence ought to be admitted, and the question of its effect left to the determination of the jury."

In case of *Com.* v. *Seibert*, referred to in *Whar. on Hom.* (*pp.* 227, 228), "the court, for the purpose of aiding in the discovery of the *character* of the homicide, permitted the defendant to prove the general character and disposition of the deceased, as a *quarrelsome, fighting, vindictive and brutal man*, of great physical strength. (*P.* 227.) Judge Comingham, in charging the jury, said: "You may inquire, too, whether the deceased, making, as is contended, the first assault, was bold, strong and of a violent and vindictive character, and the defendant much weaker and of a timid disposition, and how far their power was equalized by weapons in the hands of the latter."     *     *     *     *     *.     *

"In the assault of a strong man upon a boy, or a female, of a powerful individual upon a weaker, the necessity of taking life in self-defence under an ordinary attack, will be more easily discoverable than in an attack by one man upon another under more equal circumstances." (*P.* 228.)

In *Dukes* v. *State*, decided in 1858 (11 *Ind.*, 557), this point arose: At the trial, the prosecution, upon objection by prisoner's counsel, was permitted to give evidence of the character of deceased. The Supreme Court held this ruling correct. In their opinion, per Perkins, J., they say: "The State was permitted to give evidence of the character of deceased, White. As a general rule, it is the character of the living—the defendant on trial for the commission of crime, and not of the person on whom the crime was committed—that is in issue, and as to which, therefore, that evidence is admissible. But in a case like the present, where the question arises whether the accused acted, in the commission of a homicide, upon grounds that justify him in the deed, it would seem that the character of

the deceased might be a circumstance to be taken into consideration." * * * " Where, as in this case, these facts may not have been known, we do not see how the evidence could be entitled to much weight."

In the case of *State* v. *Hicks*, decided in 1859 (27 *Mo. R.*, 588), the prisoner was indicted for murder. There was evidence tending to show that deceased had assaulted, or attempted an assault, upon the prisoner. In speaking of the request on the part of the prisoner's counsel, to charge the jury, that if they believed from the evidence that the deceased was of rash, turbulent and violent disposition, then it was a circumstance for the consideration of the jury, in considering the reasonable cause for defendant's apprehension of great personal injury to himself.

The court, per Richardson, J., say: " In my opinion, *this instruction ought to have been given.* If the defendant killed Mills under circumstances that showed he did not have reasonable cause to apprehend immediate danger of violence to himself, he cannot defend himself on the ground of the vicious character of the deceased, for the law promises the same protection to the persons of all men, and it is as great a crime, in the eye of the law, to kill, without cause, a bad man as a good one. But the imminence of danger, that will justify us in acting upon the instinct of our nature in repelling a blow before it is received, often depends on the character of the assailant. The menacing attitude of a person generally peaceable and law-abiding, would often excite no just apprehension of danger, whilst similar conduct of a fierce, vindictive and passionate man, would naturally alarm our fears, and make us prompt in anticipating his purposes. When danger is threatened and impending, we are not compelled to stand with our arms folded until it is too late to strike, but the law permits us to act on reasonable fear; and therefore, when the killing has been under circumstances that create a doubt, as to whether the act was committed in malice, or from a sense of real danger, the jury have the right to consider any testimony that will explain the motive that prompted the accused." (*Queensbury* v. *State*, 3

*Stew. & Port.*, 308 ; *Munroe* v. *State*, 5 *Geo.*, 137.) "The judgment will be reversed, and the cause remanded." (*Pp.* 590, 591.)

In *Payne* v. *Com.* (1 *Met. Ky. R.*, 370), decided in 1858, it was held that the character of deceased for violence, and habitually carrying concealed deadly weapons, was competent evidence for the defendant.

The court, per Duval, J., in reference to this point, say (*p.* 379) : "We are of opinion that the testimony in question was admissible, in view of all the other proof as presented by this record. The general principle upon which the admissibility of such evidence depends, was recognized in this court, by the cases of *Rapp.* v. *Com.* (14 *B. Mon.*, 614), of *Meredith* v. *Com.* (18 *B. Mon.*, 49), and *Cornelius* v. *Com.* (15 *B. Mon.*, 546), although the point was not in either of these cases directly presented."

In *State* v. *Field* (14 *Maine R.*, 244), the prisoner was indicted for the murder of his brother. The deceased went into a room occupied by the prisoner, which each had an equal right to occupy. The prisoner, immediately upon the deceased entering the room, struck him with an axe, and killed him. Deceased did not assault, or attempt to assault the prisoner. Deceased did no act which he had not a legal right to do. On that trial, the counsel for the prisoner offered to prove that deceased was in the habit of drinking to excess whenever he could get rum, and that drinking spirits of any kind had the effect of making him quarrelsome, dangerous and savage. The court below ruled out this evidence. The Supreme Court sustained this decision.

In *Com.* v. *York* (9 *Met.*, 93), the point as to the admissibility of evidence, touching the violent character of the deceased, did not arise.

*State* v. *Thawley* (4 *Harring.*, K., 562), was a case at *nisi prius*. The circumstances of the homicide do not appear in the report. It does not appear whether defendant was assaulted by deceased, or what justification or palliation, if any, the prisoner had for taking the life of the deceased. Yet,

according to the report, the prisoner was acquitted. This cannot be regarded as an authority against the admission of evidence of the violent character of deceased, where he has assaulted the prisoner. In this case, Harrington, one of the judges, intimates, that he has known of the introduction of evidence of this kind in four cases, and that such evidence comes within the reason of the principle, that, " in particular cases, where the character of the prosecutor is mingled with the transaction in question, it forms a point material to the issue, and may consequently be inquired into." (*Ros. Ev.*, 88.)

In *Wright* v. *State* (9 *Yerg. R.*, 342), the prisoner was indicted for maliciously stabbing Underwood, a free man of color. Upon the trial, the defendant's counsel offered to prove that Underwood, the prosecutor, was a turbulent, violent, saucy fellow. There was no pretence that he had assaulted prisoner, nor was proof offered that he had assaulted others. The Supreme Court, per Turley, J., upon this point, say: " The second cause assigned as error, is that the court refused to hear proof, to show that the prosecutor, Underwood, who is a free man of color, was a turbulent, insolent, saucy fellow. We think there was no error in this; for, supposing him to have been of the character described, we cannot see how this would have extenuated the offence of stabbing him, and most certainly the prisoner does not stand in such a relation towards him as to justify his being very particular in demanding respectful treatment from him."

Here it will be perceived that the offer was not to prove that deceased was a man of violent habits, and accustomed to commit assaults upon peaceful and unoffending persons, but that he was a " turbulent, violent and saucy fellow." The offer of proof related merely to *words* used, and not to *acts* done by the prosecutor.

In *State* v. *Tilly* (3 *Iredell,* 424) the prisoner was indicted for the murder of one William G. Martin. There was no evidence on the trial showing or tending to show that the prisoner had been assaulted by the deceased. The prisoner's counsel proposed to inquire of one of the witnesses " whether the deceased

did not bear the character of being high-tempered, overbearing and oppressive towards his overseers and tenants, but the question was objected to, and ruled out." There was no offer to prove that deceased was in the habit of assaulting or committing violence of any kind, either upon his overseers or others.

In *State* v. *Barfield* (8 *Iredell*, 344), the prisoner was convicted of the murder of Alfred Flowers. The prisoner was not assaulted by the deceased, nor was deceased guilty of any acts of violence whatever.

The counsel for the prisoner then offered to prove by a witness who had formerly lived with the deceased, that his general character was that of a violent, overbearing and quarrelsome man, and that such were his domestic habits. On objection made on the part of the State, the court rejected the evidence. This ruling was sustained. The court, per Ruffin, Ch. J. (*p.* 50), say : "It is too much to stake the life of one man upon the fears of another of danger from him, merely upon his character for turbulence, and when he is making no assault. Such would be the case here, if the evidence had been received ; for the prisoner's own witnesses proved that there was no assault on him."

In *State* v. *Jackson* (17 *Miss.*, 544), the prisoner was indicted "for feloniously assaulting and shooting one Jonathan Millsap, with intent to kill him." The testimony showed that the deceased did not assault or attempt to assault the prisoner. The prisoner, at a distance of thirty yards from the deceased, shot him—the latter being unarmed. The court excluded the evidence. The Supreme Court sustained this ruling. In their opinion, delivered by Ryland, J., they say : "As to the character of the man shot (that is, Millsap), for danger and desperation, it was properly excluded from the jury. There may be cases where the general character would be proper evidence before the jury ; it would explain the situation of the parties, and their acts and deeds at the time." (*P.* 548.)

In *Oliver* v. *State* (17 *Ala.*, 587), the prisoner was indicted for the murder of one William E. Hammond. The point as

Pfomer *v.* The People.

to the character of deceased, did not in any way arise in the case. The court held that "whether the circumstances are, such as to create a reasonable belief in the mind of the slayer that a necessity exists for taking the life of another, is a question for the jury, in the solution of which they may consider the condition of both parties." (*P.* 588.)

*Wharton*, in his *Am. Cr. Law* (§ 641, *4th ed.*), observes: "On the trial of an indictment for homicide, evidence to prove that the deceased was well known and understood generally by the accused and others, to be a quarrelsome, riotous and savage man, is inadmissible. In the eye of the law, to murder the vilest and most abject of the human race, is as great a crime as to murder its greatest benefactor. In one or two cases, however, while the law, as above laid down, was distinctly recognized, it has been said that when the killing has been under such circumstances as to create a doubt as to the character of the offence committed, the general character of the deceased may sometimes be drawn in evidence. But the rule undoubtedly is, that the character of the deceased can never be made a matter of controversy, except when involved in the *res gestœ*, for it would be a barbarous thing to allow A. to give as a reason for killing B., that B.'s disposition was savage and riotous."

The same author, in his work on Homicide (*p.* 249), says: "It has already been briefly considered how far the character of the deceased for peace and order may be drawn into question, when the defence taken is, that the defendant, from all the circumstances in the case, of which the deceased's character was one, had reason to be in fear of his life. As was then shown, there have been cases in which courts have been obliged to allow such evidence to be introduced, and it is easy to imagine cases in the future in which it would be impossible to exclude it. But, as a general principle, the rule continues unbroken that evidence that the deceased was riotous, quarrel-some and savage, is inadmissible, even though such knowledge be brought home to the defendant himself. Any other rule

would allow a private citizen to take upon himself the province of government in the punishment of crime."

The only authorities cited by this author in his *American Criminal Law,* and his *Law of Homicide,* are: *Queensbury* v. *State,* 3 *Stew. & Port.,* 315; *State* v. *Tackett,* 1 *Hawk.,* 210; *Wright* v. *State,* 9 *Yerg.,* 342; *State* v. *Jackson,* 17 *Miss.,* 544; *State* v. *Tilly,* 3 *Ired.,* 424; *State* v. *Field,* 14 *Maine R.,* 248; *Com.* v. *York,* 9 *Met.,* 110; *State* v. *Hawley,* 4 *Harring.,* 562; *Com.* v. *Hilliard,* 2 *Gray,* 294; *Oliver* v. *State,* 17 *Ala.,* 587; *Com.* v. *Seibert,* *Whar. Hom.,* 227, 228.

Wharton does not state the grounds on which the testimony is admitted or excluded. With an impartiality as felicitous as it is rare among elementary writers, in emphatic and unambiguous terms he states the law *both ways,* and escapes from the inconsistency resulting from his liberal and *comprehensive* views, only by asserting that the testimony is sometimes admitted and sometimes rejected. I have shown the principle running through all the adjudications, and I have harmonized all the cases entitled to any weight. I have shown that *all of the above cases* referred to by Wharton (with the exception of *Com.* v. *Hilliard,* 2 *Gray,* 294), contain the doctrine for which I contend, to wit, that whenever *the deceased assaulted the prisoner,* evidence of the violent character of the deceased was admissible. I have also shown that the same doctrine is recognized and adjudicated in the following cases, to which Wharton does not refer upon this point: *Monroe* v. *State,* 5 *Geo.,* 85; *Keener* v. *State,* 18 *Geo.,* 194; *Pritchett* v. *State,* 22 *Ala.,* 39; *Franklin* v. *State,* 29 *Ala.,* 14; *Dukes* v. *State,* 11 *Ind.,* 557; *State* v. *Hicks,* 27 *Mo.,* 555; *Payne* v. *Com.,* 1 *Met. Ky. R.,* 370; *State* v. *Barfield,* 8 *Ired.,* 344.

*Commonwealth* v. *Hilliard* (2 *Grey,* 294), was a *nisi prius* case. The report says: "There was evidence tending to prove an assault by the deceased upon the defendant immediately before the striking of the fatal blow." The court refused to allow evidence of the violent character of the deceased. It does not appear that any *writ of error* in the case was ever applied for, or that the case was carried further. The prisoner

was convicted of manslaughter only. The court, in the short opinion delivered upon the refusal to admit the evidence in question, cited no authority, nor did the Attorney-General, in opposing its introduction, cite any, except *Commonwealth* v. *York*, in which the point was not raised, discussed, or even alluded to.

This single *nisi prius* case is the only one containing a doctrine adverse to that for which I have contended. It is submitted that it is not in the power of a Massachusetts court, by a single decision at *nisi prius*, to overthrow an unbroken series of adjudications in all the States of this Union. As an illustration of the fact, that the Supreme Court of Massachusetts is liable to err, it may not be considered *mal-apropos* to refer to the case of Dr. Webster. On the trial of *Cancemi* at the New York Oyer and Terminer, the learned judge who presided, in his charge to the jury, read with approval an extract from the charge of Chief Justice Shaw, in the case of Webster, in relation to the weight to be given to the good character of the prisoner. For this error a new trial was granted. The Court of Appeals held that the doctrine laid down by the Supreme Court of Massachusetts, in that case (5 *Cush.*, 314), was not law, and that character was of far more importance than that court was disposed to concede.

In the case at bar, "it was conceded by the prosecution that the defendant was a person of good character for integrity, peace and quietness." In such a case, it was especially proper. that he should be allowed to prove the ruffianly character of deceased. With the solitary exception of *Com.* v. *Hillyard*, not a single case sustaining the ruling of the judge below can be found, while the authorities are uniform and abundant, showing his error.

In a word, all the authorities show that if the prisoner be assaulted by the deceased, evidence of the violent character of the latter is admissible. In the case at bar, Pfomer, the prisoner, was assaulted by Sturgis, the deceased. It appears from the case, that deceased said he wanted "to lick no man but the baker" (prisoner), that he "took hold" of prisoner,

and that he (deceased), "hit defendant just as if he wanted to get him in a passion."  ·  *

The testimony was therefore clearly admissible, and the exclusion of it by the court below was error, for which a new trial should be granted.

2d. In order to render the testimony as to the violent character of deceased admissible, it was not necessary to prove that it was known to the prisoner.

Even where the deceased has made threats, with reference to the prisoner, they are admissible in evidence, *although not communicated to him.*

In *Stewart* v. *State* (19 *O. R.*, 302), defendant was indicted for murder, and convicted. The Supreme Court held that it was competent for the defendant to prove that the person alleged to have been murdered, and others, had agreed to go to the house where defendant boarded, for the purpose of quarreling with him, and that they had approached him with that intent at the time the affray commenced, which resulted in the homicide ; and to prove the conversation of the parties in relation to such agreement, though the defendant had not been informed of the intent of the parties in approaching him.

A new trial was granted on account of the exclusion of this testimony. The Supreme Court, per Caldwell, J., in discussing this point, say : "If such had been the object of these persons in this visit that night, it ought to be proved, although no information of the kind had been, in language, conveyed to the defendant. He might be able, when they met, from their manner and conduct to discover their intention, although they had made no verbal expression." (*P.* 306.)

In *Keener* v. *State* (18 *Geo. R.*, 194), it was held that previous threats, if offered for the purpose of showing the state of mind or feeling of the deceased, were inadmissible, although not communicated to the prisoner.

In *Campbell* v. *People* (16 *Ill. R.*, 18), this point arose. The Supreme Court, per Caton, J., say : "Upon the trial the defence offered to prove that on that day, and at other times shortly before his death, the deceased had made threats against

the prisoner. This evidence the court ruled out, and an exception was taken. In this the court unquestionably erred, although they may never have come to the knowledge of the defendant till after the homicide was committed. If the deceased had made threats against the defendant, it would be a reasonable inference that he sought him for the purpose of executing those threats, and thus they would serve to characterize his conduct towards the prisoner at the time of their meeting, and of the affray." A new trial was granted.

In the case of *Cornelius* v. *Com.* (15 *B. Mon. R.*, 539), the prisoner was charged with murder. On his trial he proved threats on the part of the person killed, to kill him, which threats had been communicated to him. He then offered to prove other threats, *not communicated*, which the court refused to admit. It was held to be error to exclude such proof.

In *Dukes* v. *State* (11 *Ind.*, 557), before cited, on the trial the prosecution were allowed to prove the character of deceased, on objection by prisoner's counsel, although it was not proven or sought to be shown that the prisoner had any knowledge on the subject. Exception was taken. The Supreme Court of Indiana sustained this ruling, although they say: "Where, as in this case, these facts may not have been known, we do not see how the evidence could be entitled to much weight." Whether entitled to much weight or not, the court held the testimony to be admissible.

If threats are admissible in evidence, although not communicated, on the ground that such proof tends to show the *mental status* of the deceased, at the time of the homicide, *a fortiori*, the character of the deceased for violence is admissible. The character of deceased for ruffianly violence, which he has built up for a series of years, would shed much more light on his mental *status*, and tend far more forcibly to illustrate his acts, than threats made some time previously, which might have been abandoned.

In some of the cases cited on Point I, it appears that the prisoner knew, and in others that he did not know, of the violent character of the deceased. The admissibility of the evi-

dence has not been made to turn upon proof that prisoner possessed such knowledge, but the testimony has been admitted or rejected, according to the fact, whether deceased *assaulted* prisoner, or made some demonstration, which, in connection with his violent character, might give, or tend to give, the prisoner reasonable ground to believe he was in danger of loss of life or great bodily harm.

3d. In any point of view it was the right of the prisoner on the trial to introduce evidence of the violent character of the deceased.

This issue was opened by the prosecution, as will appear by the following extract from the re-direct examination of Frederick Schwitzgebele, a witness for the prosecution: *Re-direct examination:* Sturgis was in liquor that night; he generally came in every evening; *he generally conducted himself quietly,* and did no harm when he came in early in the evening; I never saw *the deceased do anything out of the way in my life;* I have known him a long while; he was in the habit of coming in our saloon almost every night for supper; I have been in that saloon several years, and was always in whenever the deceased and his friends came for supper; *I never saw him commit any act of violence, or do anything wrong.*"

In *Dilks* v. *State* (11 *Ind.,* 557), cited on the first subdivision of this Point, the Supreme Court held that the prosecution had a right to go into evidence of this kind in the *first instance.* At all events, it is clear that, after the prosecution had introduced evidence on this point, it was competent for the prisoner to controvert that testimony.

It is true, it does not appear from the bill of exceptions that the prisoner's counsel objected to the evidence. It is equally true that the District Attorney did not object to the evidence on this point sought to be introduced by the prisoner. The learned judge, upon the trial, permitted the prosecution to give evidence upon the point in question, but of his own motion prohibited the defendant from introducing any testimony upon the subject.

4th. If it were necessary (which it is not), to show that prisoner knew of the violent character of the deceased, one of the best means of proving such knowledge, would be to prove the *existence* of the character in question.

How else could such knowledge be shown, ordinarily, except from its notoriety in the town, city or locality where the prisoner lived ?

At all events, it should be left to the jury to infer the prisoner's knowledge of such character from its notoriety.

II. The court below clearly erred in refusing to allow the prisoner to prove that " deceased was in the habit of committing violent assaults with knives and pistols upon the proprietors of restaurants, like that kept by the prisoner; and that deceased was in the habit of maliciously and wantonly destroying the property in such restaurants, and beating the inmates in such restaurants. The court refused to allow the evidence, or any part thereof, to be given; to which refusal the counsel for the defendant then and there duly excepted."

In *Monroe* v. *State* (5 *Geo.*, 85), cited on Point I, it was held, (as has already been shown) that the prisoner had a right to prove the character for violence possessed by the deceased, in brothels, as contradistinguished from his peaceful character elsewhere. Clearly, within the reasoning of this case, the violent character of deceased in restaurants was admissible. Besides, the prosecution had opened the door to this evidence, in proving by the witness, Schwitzgebele, that the deceased possessed a peaceful character in restaurants, or, rather, in the restaurant where the homicide occurred.

It will be observed that the testimony was ruled out, not on the ground that it was not offered to be proved that prisoner knew the character of deceased in this particular. The evidence was excluded unconditionally and unqualifiedly.

III. The court below erred in charging the jury "that if they (the jury) believed the prisoner was in great danger of loss of life or serious personal injury at the hands of the deceased, and killed him in that defence of life or person, he

was justified, *otherwise not.* To this portion of the charge the counsel for the prisoner then and there duly excepted."

The court reiterated the same idea in another part of the charge, as will appear by the following extract from the bill of exceptions:

"The court thereupon charged the jury, that to justify the taking of life, the danger of the person taking it must be real and imminent. To this portion of the charge the counsel for the prisoner then and there duly excepted."

In the case of *Shorter* v. *The People* (2 *Comst.*, 193), it was held that the charge of the court to the jury, "that, to render the killing justifiable, the jury should be satisfied that there was, in fact, imminent danger that the deceased would commit some great personal injury upon the prisoner," was erroneous.

The charge in this case was the same as in the case of Pfomer. The Court of Appeals distinctly held that one who is without fault himself, when attacked by another, may kill his assailant, if the circumstances be such as to furnish reasonable ground for apprehending a design to take away his life, or do him some great bodily harm, and there is also reasonable ground for believing the danger imminent that such design will be accomplished, although it may afterwards turn out that the appearances were false, and there was, in fact, no such design, nor any danger that it would be accomplished.

This doctrine was re-affirmed by the Court of Appeals, in the case of *The People* v. *Sullivan* (3 *Seld.*, 396). The court, per Johnson, J., say : " It was contended on the argument that this charge required the jury to find whether imminent danger *actually* existed, and not merely whether Sullivan had reasonable ground to believe that it existed. If this construction of the charge was correct, the case of *Shorter* v. *The People* (2 *Comst.*, 197), would show it to be erroneous, but we do not so understand the charge."

It will be seen that the charge of the court below in this particular, was in direct violation of these two decisions of the Court of Appeals.

IV. The court below erred in instructing the jury, "that if they believed the witnesses, the case was clearly within one of the degrees of manslaughter, and it was for the jury to say which degree." To this portion of the charge the counsel for the prisoner duly excepted.

The court had already submitted the case to the jury, as to whether the prisoner was in imminent danger. The language of the court, in its charge, was:

"That if they (the jury) believed the prisoner was in great danger of loss of life, or of serious personal injury, at the hands of the deceased, and killed him in that defence of life or person, he was justified, otherwise not."

If it were right to submit this question of fact to the jury, it was error to withdraw its consideration from them. The effect of this appears from the fact that, although the jury had been out over twenty-four hours, yet, after this charge was given, "they thereupon retired, and after an absence of some ten minutes, returned into the court with a verdict of guilty."

The authorities cited under Point I, show that whenever the prisoner is assaulted by the deceased, it is a question *for the jury* to determine whether the prisoner had reasonable ground to believe himself in danger of loss of life, or great bodily harm.

It is plain that the court erred in this particular. In proof of this, although many cases might be cited, the following will suffice:

In the case of *Holmes* v. *State* (23 *Ala.*, 17), it was held that a charge which has the effect of withdrawing from the consideration of the jury any evidence which tends to establish the plaintiff's case or the defence, is erroneous. However correctly the judge may lay down the law in his general charge, yet, if in a subsequent specific charge, he places the case upon the existence of certain facts, on which alone it may not properly be made to turn, the effect of which, if literally followed by the jury, is to withdraw from the consideration of other facts which tend neither to disprove or materially qualify those on which the charge is predicated, injury must be presumed from

the error.   The court, per Clinton, Ch. J., say: "In *Pritchett*
v. *Monroe* (22 *Ala.*, 501), we held that a charge based upon a
hypothetical state of facts, which excludes from the considera-
tion of the jury other evidence which is before them, is erro-
neous, as tending to mislead the jury by creating the impression
that they should be authorized to reject the other evidence."
\*   \*   "Such, we think, is the effect of the charge." (*Ib.*, 25.)

   In the case of *State* v. *Harrison* (5 *Jones N. C.*, 115), it
appeared that at the trial the judge charged the jury that "if
the prisoner went to a house, carrying a deadly weapon, with
the purpose of provoking a fight if he found a certain person
there, and did so, he was guilty of murder, although the de-
ceased made the first assault."   This was held to be error, on
the ground that it was for the jury to say whether this state
of facts alone, if true, or in connection with other circum-
stances, proved the defendant guilty of murder.

   In conclusion, I will cite a case recently decided by this
court, which is precisely in point:

   One James Breen was indicted in the New York General
Sessions, for larceny.   He was convicted of that offence.   On
the trial, it appeared that Thorpe (who employed Breen as a
bar-keeper), with a view to detect him—his suspicion having
been previously excited—marked certain bank bills, and put
them in the money till.   The next night, after Breen had re-
tired to bed (according to the testimony of Spencer, another
witness), these bills were found in his possession.   It was the
duty of Breen to hand over to his employer, every night when
the bar closed, all the money.   The court below charged the
jury " that the first two witnesses, Thorpe and Spencer, testi-
fied to a state of facts, which, if *true*, established a larceny of
the prisoner, and rendered it incumbent on the jury to con-
vict him."   To this the prisoner's counsel excepted.   This
court sustained the exception, and granted a new trial.   It was
very properly held, that whether the circumstances, *if true*,
established guilt, or whether they were as consistent with inno-
cence as with guilt, was purely a question of fact for the jury.

Pfomer *v.* The People.

In view of the rule of law cited in that case, and to which I invoke the attention of the court in this, no other decision could well have been made.

" It is therefore a rule of criminal law, that the guilt of the accused must be fully proved. Neither a mere preponderance of evidence, nor any weight of preponderance, is sufficient for the purpose, unless it generate full belief of the fact, to the exclusion of all reasonable doubt." \* \* \* \* ." It is elsewhere said, that the persuasion of guilt ought to amount to a moral certainty," or, " such a moral certainty as convinces the minds of the tribunal, as reasonable men, beyond all reasonable doubt." "And this degree of conviction ought to be produced, when the facts proved coincide with and are legally sufficient to establish the truth of the hypothesis assumed—namely, the guilt of the party accused—and are inconsistent with any other hypothesis. For it is not enough that the evidence goes to show his guilt; it must be inconsistent with the reasonable supposition of his innocence." (3 *Greenl. Ev.,* § 29.)

On the 6th of March, 1858, the general term, first district (composed of Justice Davies, Clerke and Sutherland), rendered a decision granting a new trial in the case of Breen, upon the point here stated, as well as upon another point not necessary to state.

The court below erred in each of the four points specified. A new trial should be granted.

*Nelson J. Waterbury* (District Attorney), for the defendant in error.

I. Evidence of the character of the deceased was rightly excluded, with the restriction laid down in the first ruling of the court. Such evidence is admissible where, from the facts of the killing, there is a doubt as to its character, for the purpose of establishing the theory of self-defence, in which case it must be brought to the knowledge of the defendant. It is not otherwise admissible. (*Pom.* v. *Seibert, Whar. Hom.,* 229 ;

Pfomer *v.* The People.

*Queensberry* v. *State*, 3 *Stew.*, 308; *State* v. *Field*, 14 *Maine*, 428; *State* v. *Tilley*, 3 *Ired.*, 424; *Com.* v. *Yost*, 9 *Met.*, 110.)

II. The other testimony excluded was of precisely the same nature, and its rejection must, by natural intendment, be taken to be subject to the same qualification, and there was no testimony offered to bring the subject-matter home to the knowledge of the deceased.

The last offers were also properly excluded, as relating to specific acts, disconnected entirely from the homicide in question. (*See cases cited under Point I.*)

III. The charge of the judge upon the question of self-defence, is not sufficient ground to set aside the verdict.

(*a.*) An omission to charge cannot be taken advantage of without a request to charge, and the same rule should apply to the remarks of the judge in this case. (*State* v. *Straw*, 33 *Me.*, 554.)

(*b.*) In the case of the *United States* v. *Wilberger* (3 *Wash. C. C. R.*), the presiding justice charges that the danger must be "apparent," "evident," and "imminent," though it afterward "turn out to have no actual existence," and so our statute requires that the danger shall be imminent.

The language of the judge is to be construed liberally, in view of the fact that his attention was not called to it, and as merely fixing, like the words "imminent danger" in the statute, the *character* of the danger *apprehended* to exist.

IV. Even though the charge be erroneous in this respect, there is no ground for a reversal. The same rules apply to bills of exceptions in criminal as in civil cases, and a verdict will not be set aside for a misdirection which could work no injury. (*People* v. *Wiley*, 3 *Hill*, 213; *Hagden* v. *Palmer*, 2 *Hill*, 205; *Shorter* v. *The People*, 2 *Comst.*, 192.)

There is no evidence anywhere in the case to call for any discretion whatsoever upon the subject of self-defence, and the charge was in that respect wholly irrelevant to the facts of the case, and could not, upon its face, or by intendment of law, work any injury to the defendant. (*Shorter* v. *The People*, 2 *Comst.*, 192; *Whar. on Hom.*, 212, *et seq. Case, passim.*)

Kalle *v.* The People.

*By the Court*, SUTHERLAND, P. J. We are unanimous in the opinion that there must be a new trial in this case. After the jury had been out some twenty-four hours, they returned into court and asked for further instructions on the *law*. The judge who presided on the trial, stated that if they believed the witnesses, they should convict of manslaughter, but it was for them to say in what degree. It was purely a question of fact for the jury to determine as to whether a case of manslaughter had been proved; it was within their province to say whether the prisoner, at the time he slew the deceased, had reasonable ground to believe his own life in danger. Clearly, where a case rests upon circumstances, it is for the jury to construe those circumstances, and say whether they necessarily impute guilt to the defendant, or whether they are consistent with his innocence. To uphold the charge in this case, would be to sustain a principle, the effect of which would be to substitute the court for the jury. We do not deem it necessary to discuss the other points which were argued by the counsel for the plaintiff in error.

Judgment reversed, and new trial ordered.

SUPREME COURT. New York General Term, May, 1859. *Roosevelt, Sutherland* and *Lott,* Justices.