Holler *v.* The State.

*N. Trusler, J. S. Scobey, C. Ewing, J. K. Ewing,* and *W. O. Foley,* for appellant.

*W. Cumback, S. A. Bonner, J. Gavin,* and *J. D. Miller,* for appellee.

*Petition for a rehearing overruled.

————•————

| 37 | 57 |
| 130 | 229 |

| 37 | 57 |
| 149 | 404 |

| 37 | 57 |
| 154 | 670 |

## HOLLER *v.* THE STATE.

CRIMINAL LAW.—*Murder.*—*Possession of Weapon by Deceased.*—*Proof of Threats by Deceased.*—On a trial for murder, in which the witnesses for the defence had testified that the deceased had a bowie-knife in his possession the night of the murder, and the State had introduced evidence to show that he had no such knife, and the defendant proposed to prove threats made by the deceased when the knife was exhibited, and also when it was not shown, against the life of the prisoner, or of injury to him, some of which threats were not shown to have come to the prisoner's knowledge;

*Held,* that evidence of the possession of the knife by the deceased a short time before the date of the occurrence which resulted in his death, was proper for the consideration of the jury, and also evidence of the threats made by the deceased, whether known to the defendant or not, and either when exhibiting the knife or at other times.

SAME.—*Impeachment of Rebutting Witness.*—Although a witness has been cross examined, on his original examination by the State, yet, if he is again introduced by the State and examined in rebutting, it is proper to lay the foundation then for his impeachment upon any evidence then given for the State, and to subsequently introduce witnesses for that purpose.

APPEAL from the Wayne Criminal Court.

DOWNEY, J.—The appellant was indicted, with his brother, for murder in the first degree, in killing one Nathaniel Tibbetts, on the 17th day of October, 1864, in Wayne county.

He was tried at the October term, 1871, found guilty of manslaughter, and his punishment fixed at ten years' imprisonment in the state prison. He moved for a new trial, for the reasons, among others, that the court had improperly excluded certain evidence offered by him; that the court

had misdirected the jury, and had improperly refused to instruct the jury, as prayed for by him; that the verdict of the jury was contrary to law, and not sustained by the evidence.

This motion was overruled by the court, and judgment was rendered against the defendant upon the verdict.

The evidence, and also the instructions, are set out in bills of exceptions in the record. There are twelve alleged errors assigned, all of which, with one exception, are simply reasons for which the court might have granted a new trial, if deemed sufficient. Only one, that is the second, which alleges that the court erred in overruling the defendant's motion for a new trial, raises any question for our consideration. This assignment requires us to examine the reasons urged in the criminal court for a new trial, which we proceed to do.

The State's theory of the case, as developed by her evidence, was, that the deceased and his sons Jacob and William, at about seven o'clock in the evening, were at the store of Lyner, in the town of Abington, and started to go home. The defendant was sitting in front of the store on a horse-block. Afterward his brother Granville joined him. When the deceased and his sons got part of the way home, and near an alley and barn, the defendant and his brother came out around the barn, and the defendant said to the deceased, "Tibbetts, God damn you, what did you strike me the other night for?" Deceased spoke, and said, "Francis, I thought you were injuring my boy, or I should not have struck you." The deceased stepped on about two steps, when defendant said, "God damn you, I'll show you," and drew up and hit him with a rock. The defendant was within about two steps when he threw at him. When defendant threw the stone, Granville Holler said to Jacob Tibbetts, "God damn you, don't you interfere;" and as Jacob went on toward home, he threw stones at him. The stone thrown at the deceased struck him on the back part of the left side of his head, and he immediately fell to the ground. The

Holler *v.* The State.

defendant went up to him, and stood over him, after he fell. The other son ran home. The deceased was carried to his home in an unconscious condition, and died from the effects of the injury at four o'clock next morning. The stone thrown, and which struck the deceased, would have weighed two pounds.

The defendant's theory of the case, as testified to by his brother, supported, perhaps, to some extent by others, was that the deceased came to the barn where he and his brothers were, and where they, or one of them kept a horse, or horses, accompanied by his two sons. The deceased said, "Here is the son of a bitch now." The defendant said, "Why do you jump on me now, when you and your crowd jumped on me the other night and beat me up?" The deceased said, "I'll settle that with you, and that pretty damned quick," and drew a bowie-knife from his person. The defendant said, "Tibbetts, you are not going to strike me with that knife, are you?" Tibbetts said, "Yes, I'll cut your damned guts out of you." As he said this he advanced two or three steps toward the defendant, and then halted. He motioned with his hand, and said, "Come up, Jake." While his head was turned, the defendant stooped and picked up the stone and threw it at the deceased, knocking him down. He was eight or ten feet from the defendant when the stone was thrown. The defendant did not advance toward the deceased. Jacob Tibbetts, when his father called to him to come up, had a revolver in his hand, which he drew from his belt. These opposite statements of the facts are taken from the testimony of the principal witness on each side of the case.

Two or three days before the killing of the deceased by the defendant, a difficulty had taken place in which the deceased had beaten the defendant with a gun-swab; and this was the occurrence referred to in the conversation between the parties at the time of the killing.

It was testified that, after this affair, and, of course, before the killing of Tibbetts, he made threats of further violence

toward the defendant, which had been communicated to the defendant.

It became a question, on the trial, whether or not the deceased had a bowie-knife at the time when he was killed. His son had testified that he had not, and that he did not own any such knife.

The defendant offered to prove by Isaac Hunt, a competent witness, that between the time of the beating with the gun-swab and the time of the killing of the deceased, the witness saw the deceased have a bowie-knife, with a blade six or eight inches long, and that he said, at the time, that he intended to kill the defendant with it. This evidence, both as to the possession of the knife, and as to the declaration or threat of the deceased, was excluded by the court. He offered to prove the same facts by Reuben Robbins, with reference to the possession of the knife by the deceased, and his threats as to what he intended to do with it. This evidence was also excluded.

He proposed to prove by other witnesses threats of violence to the defendant, made by the deceased, not connected with the possession and exhibition of the knife, within two or three days previous to the killing, which were also excluded. To all of these rulings there were proper exceptions.

It was not shown that these threats of the deceased were communicated to the defendant before the killing, and it was on this ground, we presume, that the learned judge who presided at the trial excluded the evidence. We infer that this was the ground of the exclusion, for the reason that such threats as had been communicated to the defendant were admitted in evidence.

As the defendant's witness had testified that the deceased, on the night when he was killed, had a bowie-knife, and the State insisted that he had not, we think the possession of such a knife by the deceased, so shortly before the occurrence, was proper evidence to go to the jury; and as to the threats made, both when the knife was produced, and when

Holler *v.* The State.

it was not, we think they were admissible in evidence without reference to whether they had or had not been communicated to the defendant. If the defendant had made previous threats of killing the deceased, it is very clear that they would have been admissible in evidence, and we cannot see any good reason why the threats of the deceased, against the defendant, are not also competent evidence.

In *Cornelius* v. *Commonwealth*, 15 B. Mon. 539, "in a trial of a prisoner charged with murder, he proved threats on the part of the person killed to kill him, which threats had been communicated to the prisoner. He then offered to prove other threats not communicated, which the court refused to admit. Held by the court of appeals, that it was error to exclude such proof; its tendency was to confirm the proof of the threats already proved, and to show the intention of the deceased to attack the prisoner."

In *Campbell* v. *The People*, 16 Ill. 18, upon the trial the defence offered to prove that on that day, and at other times shortly before his death, the deceased had made threats against the prisoner. This evidence the court ruled out, and an exception was taken. The Supreme Court say: "In this the court unquestionably erred, although they may never have come to the knowledge of the defendant till after the homicide was committed. If the deceased had made threats against the defendant, it would be a reasonable inference that he sought him for the purpose of executing those threats, and thus they would serve to characterize his conduct toward the prisoner at the time of their meeting, and of the affray. If he had threatened to kill, maim, or dangerously beat the defendant, it would be a fair inference, especially so long as the evidence shows that he had a hatchet in his hands, that he had attempted to accomplish his declared purpose, and if so, then the prisoner was justified in defending himself, even to the taking of the life of his assailant, if necessary. While the threats, of themselves, could not have justified the prisoner in assailing and killing the deceased, they might have been of the utmost importance in connec-

tion with the other testimony in making out a case of necessary self-defence. The evidence offered was proper, and should have been admitted."

In *Keener* v. *The State of Georgia*, 18 Ga. 194, Reese, the deceased, had made threats against the defendant to one Cosby, who was called as a witness; the testimony was rejected, mainly on the ground that the threats had not been communicated to the defendant prior to the killing of the deceased. In the opinion of the court, delivered by LUMPKIN, J., they say: "Without stopping to inquire whether the facts related by the witness, apart from the threats, were not admissible, we prefer to confront the question directly; and to consider whether or not the evidence of Cosby, taken as a whole, should not have been received. Keener is indicted for killing Reese; his defence is, that Reese manifestly intended, by surprise or violence, to take his life, or do him some bodily hurt; that the circumstances were such as to excite the fears of a reasonable man; and that he acted under the influence of those fears, and not in the spirit of revenge. The proof is, that two nights before the tragedy occurred, Reese entertained the most deadly hostility toward Keener. Jealousy, another name for insanity, of the most malignant character, had taken possession of his bosom, and was shaking the throne of his reason to its very foundation. Keener had taken his woman from him, and if the damned coward ever crossed his path he would kill him; he was going out on McIntosh street before long, and would kick up hell there. Prophetic words! He sowed to the wind, and reaped the whirlwind. What a terrible lesson! Well might the wise man say of the house of the strange woman, 'The dead are there.'

"Ought not this conversation, whether communicated to Keener or not, to have been admitted as a substantive fact to show the *malus animus*, or evil intent, toward Keener, with which Reese went to that house that night? Laying aside all technical rules and reasoning, we ask, with the knowledge of the mind and feelings of the deceased disclosed by this

witness, would we not, and ought not the jury, to listen more indulgently to the alleged apprehension of injury on the part of Keener, as well as to the facts and circumstances upon which he relies to justify his conduct? Do not these pre-*vious* threats throw light upon Reese's conduct, up to the time of the killing? Do they not serve to illustrate the transaction ?"

After an examination of authorities, the learned judge concludes on this point as follows: "Upon the authority of the note, then, as laid down by Mr. Starkie and others, and as illustrated by numerous adjudicated cases, we are clear that the testimony of Cosby should have been admitted, as it conduced to prove, in connection with other evidence, the *quo animo* with which Reese resorted to the brothel on McIntosh street that night; and that his manner and conduct corresponded with that purpose, so as to warrant Keener in believing that the same scenes were to be repeated there that night which had been re-enacted several times before, and that no alternative would be left but to retreat again, as he had done before twice or three times, or take the consequences.

"In view, then, of the frequent failure of justice from the failure of evidence, and thoroughly convinced, as we are, that no competent means of asserting the truth ought to be neglected, we think the testimony of James Cosby was improperly ruled out. It was pertinent to the issue, and ought to have been submitted to the jury. It showed the intent with which Reese resorted to this brothel, and also his feelings toward the defendant."

In *Stewart* v. *The State*, 19 Ohio, 302, it was held "competent for the defendant to prove that the person alleged to have been murdered, and others, had agreed to go to the house where the defendant boarded, for the purpose of quarreling with him, and that they had approached him with that intent at the time the affray commenced, which resulted in the homicide; and to prove the conversation of the parties in relation to such agreement, though the defendant had not

been informed of the intent of the parties, in approaching him."

In *Dukes* v. *The State,* 11 Ind. 557, this court say: "As a general rule, it is the character of the living—the defendant on trial for the commission of crime—and not of the person on whom the crime was committed, that is in issue, and as to which, therefore, that evidence is admissible. But in a case like the present, when the question arises whether the accused acted, in the commission of a homicide, upon grounds that justify him in the deed, it would seem that the character of the deceased might be a circumstance to be taken into consideration. Especially might this be the case where the accused knew that character, and also knew, at the time, the individual by whom the attack upon him or his property was made." The court adds: "Where, as in this case, these facts may not have been known, we do not see how the evidence could be entitled to much weight."

In this case, according to the report, it was evidence of the character of the deceased, offered by the State, of which the court was speaking, and not evidence of threat.

For a reference to numerous cases on the subject of proving the known character of the deceased for turbulence and violence, in cases where the defendant relies on the ground of self-defence, see case of *Pfomer* v. *The People,* 4 Park. Cr. 558.

Jacob Tibbetts was examined by the State, as a witness, in her original or opening evidence, and after the defendant had concluded his evidence in answer to the State's evidence, the State again called him as a rebutting witness, and he testified that his father had not, on the evening of the tragedy, any bowie-knife in his possession. The defendant, on cross examination, asked him if he had not, at a time and place named, to a designated person, stated that his father had a bowie-knife at that time, and indicated upon his hand the length of the blade, and he denied having made such statement. After the State had closed her rebutting evidence, the defendant proposed to prove, by a competent witness, that

Jacob Tibbetts did make such contradictory statement, which the court refused to allow him to do.

We cannot imagine on what ground this evidence was excluded.   If it was because the witness had been examined by the State in her opening evidence, the ruling was wrong. His testimony may not have been regarded of such a character as to require or make it expedient for the defendant then to enter upon his impeachment.   The impeaching witnesses may not have been at hand, or there may have been some other reason for not then impeaching him.   But when he again came upon the stand and testified against the defendant in a matter so vital to him, we are clear that he then had the right to impeach him in the manner proposed.   A rebutting witness may be impeached as well as a witness introduced in the opening of the evidence.   The proper foundation seems to have been laid by interrogating the witness as to the time, place, and person involved in the supposed contradiction, and we think the court erred in refusing to allow the impeachment of the witness.

There are many other points made to show that a new trial should have been granted, but we need not examine more of them.

The judgment is reversed, and the cause remanded for further proceedings, and the clerk is directed to certify to the warden of the state prison to return the prisoner to the jail of Wayne county.

*W. A. Peblle* and *H. C. Fox,* for appellant.

*B. W. Hanna,* Attorney General, for the State.