THE STATE OF KANSAS V. FRANCIS M. BROWN.

1. HOMICIDE; *Uncommunicated Threats of Deceased, When Admissible.* In trials for homicide, evidence of threats made by the deceased person against the defendant, but not communicated to him before the killing, is admissible in cases where the acts of the deceased in reference to the fatal meeting are of a doubtful character. The evidence is not relevant to show the *quo animo* of the defendant, but it may be relevant to show that at the time of the meeting the deceased was seeking defendant's life.

2. ———— *Such Threats, When Admissible.* Where evidence of communicated threats has been admitted, it is competent for the purpose of corroborating such evidence to introduce evidence of uncommunicated threats.

3. JURY; *Misconduct of Bailiff; Judgment Reversed.* Where the bailiff in charge of a jury in a trial for murder, enters the jury room during the deliberation of the jury on their verdict, and reads to them portions of the instructions, *held,* such misconduct as to demand the annulment of the verdict, and the setting aside of the sentence and judgment, notwithstanding the officer testifies he read the portions of the instructions at the request of the jury because they could not read them, and that he read the same correctly.

*Appeal from Chautauqua District Court.*

THE defendant was tried in April, 1878, upon an information charging him with murder in the first degree in the killing of one John S. Goodwin, in Chautauqua county, on or about the 21st day of September, 1877. Upon the trial, the jury returned a verdict of guilty of murder in the second degree. The court overruled the motion for a new trial, and sentenced the defendant to imprisonment at hard labor for the period of ten years. From this judgment and sentence the defendant appeals.

*J. D. McCue,* and *J. B. Ziegler,* for appellant:

1. Did the trial court err in excluding the testimony offered by defendant as to threats made by deceased, but which were uncommunicated to the defendant prior to the alleged homicide? We do not claim that such threats are admissible in all cases, but we do claim that this case is within the rule

authorizing their admission. The defendant seeks to justify the act of killing on the ground of self-defense; and in support of this defense, he had a right to present to the jury for their determination every fact and circumstance which was calculated to explain the conduct of himself and of the deceased upon the occasion of their encounter.

[To determine the admissibility of the proposed testimony, counsel presented a summary of the evidence, and cited *Murphy v. Dart*, 2 How. Pr. 31; *Riddle v. Brown*, 20 Ala. 412; *Jewitt v. Banning*, 21 N. Y. 27.]

No one will question the right of the state to prove anterior threats made by the defendant. Why? Because this is competent proof of malice. (3 Gr. Ev., § 15.) Why may not the malice of deceased toward the defendant be shown the same way? Malice is an ingredient of murder, and may not a defendant show that the deceased intended to murder him at the first opportunity? Otherwise, how may he avail himself of the defense, which the legislature in its humanity has given to him? It seems to us, that in very many cases, if this be denied, the right of self-defense itself would be denied. We do not contend for an indiscriminate application of the rule, but under proper circumstances that the right of the defendant to show the motives of the deceased be recognized. This rule, founded upon reason and justice, has received the approval of several courts of this country, and while different reasons are given for it, yet the reason of each will be found applicable to the facts in this case.

In all cases, when the acts of the deceased, in reference to the fatal meeting, are of a doubtful character, then, evidence which may tend to show that he sought the meeting, or began or provoked the combat, is admissible. And in this view, previous threats by the deceased, though not communicated to the prisoner, may yet tend to show the *animus* of the deceased, and to illustrate his conduct and motives, and in some cases may be important, in the absence of more direct evidence, to show which party began or provoked the fight. Threats of this character are, in proper cases, admissible.

*Little v. The State,* Cases on Self-Defense ( H. & T.), 490; *Copeland v. The State,* 7 Humph. 329; *Nelson v. The State,* 2 Swan, 237, 262; *Keener v. The State,* 18 Ga. 194; *Campbell v. The People,* 16 Ill. 17; *State v. Sloan,* 47 Mo. 604; *Pitman v. The State,* 22 Ark. 534; *People v. Arnold,* 15 Cal. 476; *People v. Scoggins,* 37 Cal. 677; *Dukes v. The State,* 11 Ind. 557; *Holler v. The State,* 37 Ind. 57; *Cheek v. The State,* 35 Ind. 492; *Burns v. The State,* 49 Ala. 370; *Palmon v. The State,* 29 Ark. 248; *Stokes v. The People,* 53 N. Y. 164; *Wiggins v. The People,* 3 Otto, 465; *State v. Goodrich,* 19 Vt. 116; *Cornelius v. Commonwealth,* 15 B. Mon. 539.

2. After the jury retired in charge of a bailiff, to deliberate upon their verdict, and while so engaged, the bailiff entered the jury room and read to the jury a portion of the instructions of the court. This was in direct violation of his oath of office. (Gen. Stat. 858, § 237.) See also, *Cole v. Swan,* 4 Greene (Iowa), 32; *Madden v. The State,* 1 Kas. 354; *McElrath v. The State,* 2 Swan, 378; *Thomson v. The State,* 26 Ark. 323; *Short v. West,* 30 Ind. 367; *Woods v. The State,* 43 Miss. 32; *Hoberg v. The State,* 3 Minn. 262; *Sergeant v. Robert,* 1 Pick. 337; *Plunkett v. Appleton,* 41 N. Y. 159; 12 Ind. 563; 13 Johns. 482; 15 Ga. 189.

*J. D. McBrian,* county attorney, for The State:

1. If the defendant seek to justify the act of killing on the ground of self-defense, he himself must be without fault in the commencement of the difficulty, and it must appear that he was closely pressed by the deceased, and had retreated as far as he could with safety ; that he had honestly and in good faith avoided the encounter; that he had not contributed in any degree to bring about the combat. The evidence certainly shows that the deceased did not go to the premises of the defendant, or in any other manner seek to bring about a meeting with the defendant.

The case of *Keener v. The State,* cited by counsel, is not a similar one to the case at bar. In that case it appeared that the deceased was not on his premises, but had gone to the

house where he met the defendant under such circumstances as to make the fatal meeting of a doubtful character as to which of the parties had brought it about, and who first sought the meeting; but in this case there can be no such doubts from the testimony. If the defendant had not gone upon the premises of the deceased, the meeting with the deceased would not have occurred. The case of *Campbell v. The People*, 16 Ill. 17, and that of the *State v. Sloan*, 47 Mo., are similar to the one already noticed, but not to the one at bar. In fact, in all the cases cited by the learned counsel for the defendant, there are circumstances tending to show that the attack was made, or at least brought about, by the deceased, and resisted by the defendant. But it is different in this case. In this case we think there can be no doubt but that the defendant was the aggressor; and he cannot justify himself in killing a man who had made no attack upon him, by showing that the deceased had made threats against him, unless the threats were communicated to him before the meeting with the deceased. (*State v. Rogers*, 18 Kas. 82.)

When a party claims a justification for killing his adversary, it must not be of his own seeking; nor when he provokes another to commence an affray for the purpose of having a pretext to take the life of his assailant.

On the question of antecedent threats, see *Lander v. The State*, in the American Law Register, vol. 2, p. 755. Previous threats, unconnected with any manifestation at the time of the killing of an intention to carry them into immediate execution, will not extenuate the crime of a deliberate homicide committed in cold blood, by one lying in wait purposely to take the life of his adversary, even if the motive which actuated the slayer was the preservation of his own life from apprehended violence from the deceased; but such killing is murder in the first degree. (1 Russell on Crimes, 669; Starkie on Ev. 721; Wharton's Am. Cr. L., 1st ed., § 254.) In some cases, uncommunicated threats on the part of the deceased against the defendant may be admissible, as in the case cited by counsel; but it is only in cases where it appears that the

The State v. Brown.

defendant was not the instigator of the encounter, and where the deceased had left his premises and met with the defendant with the probable intention of doing him injury. (2 Wharton's Cr. Law, §§ 1026, 1027; *Keener v. The State*, 18 Ga. 194; *Atkins v. The State*, 16 Ark. 568; *People v. Lombard*, 17 Cal. 316; *Newcomb v. The State*, 37 Miss. 383; *Powell v. The State*, 19 Ala. 577.)

2. It is also insisted by defendant's counsel that there was improper conduct on part of the bailiff who had charge of the jury, and for that reason a new trial should be granted. While the conduct of the bailiff was of doubtful propriety, we think all the circumstances of the matter of reading the instructions show affirmatively that the defendant could not have been injured or his rights prejudiced by such reading.

The opinion of the court was delivered by

HORTON, C. J.: The first error assigned is, that the court excluded the testimony of certain uncommunicated threats of the deceased.

It appears the defendant called witnesses on the trial to prove that the deceased said at one time " he would kill him the first time he saw him;" at another time, "that he didn't intend that Brown's cattle should run near his place;" and again, "that he had a chunk of cold lead for Brown, and would kill him the first time he saw him." These threats were uttered by the deceased three months before his death, repeated the week preceding the homicide, and again made the day prior. None of them were brought to the knowledge of the defendant, and were therefore rejected by the court.

The courts, as well as the legislatures, are constantly widening the doors for the reception of evidence, and the later and better authorities establish the rule that in a trial for homicide where the question whether the defendant or the deceased commenced the encounter which resulted in death, is in any manner of doubt, it is competent to prove threats of vio-

1. Uncommunicated threats of deceased, when admissible.

lence against the defendant made by the deceased, though not brought to the knowledge of the defendant. The evidence is not relevant to show the *quo animo* of the defendant; but it may be relevant to show that at the time of the meeting the deceased was seeking defendant's life: Whar. on Crim. Law, § 1027; *Wiggins v. The People*, 3 Otto, 465; *Little v. The State*, H. & T. Cases of Self-Defense, 490; and also the cases cited in these authorities.

The question arises upon the evidence whether the facts proved are appropriate for the application of the rule laid down. The testimony shows, that on the morning of the 14th day of September, 1877, the defendant had taken a drove of cattle from his own residence to the land of the deceased for the purpose of grazing, and left them in charge of his step-son, Meadows; that after the defendant left, the deceased set his dogs upon the cattle and drove a portion of them to the east of his place, a small number of the herd going to the southwest; that the step-son was told by the deceased, that morning, "that he had run the cattle off once, and would not run them off any more, and that he would wade in blood up to his neck before they should run on that side;" that the step-son went to the place where the defendant was and informed him of the action of the deceased, and of the threats he had made. Defendant then, in company with his step-son, started on horseback in the direction of the cattle. After starting, defendant told his step-son to go and get his shot-gun, and he would kill deceased's "d—d dogs." Defendant passed on to the south of Goodwin's house, and after passing, Goodwin was seen coming up out of the ravine east of his farm. He stopped at his fence corner, where he remained until the wife of the defendant passed. At this time, Goodwin was armed with a navy revolver. After Mrs. Brown passed, he went to a field north and east of his premises, where three of the witnesses of the state, viz., House, Sprouse and Sweeney, were at work. Upon entering this field, Goodwin removed his revolver and put it in a wagon close by, and engaged in conversation with the

parties there. Brown, upon passing south of Goodwin's house, passed out of sight of these witnesses, and did not come into sight again until Goodwin had come into the field were they were and removed his revolver. After Goodwin had been in the field a short time, the witnesses saw Brown coming out of the ravine, and upon high ground a distance southeast of Goodwin's house. He was moving his cattle to the southwest. Shortly after, Goodwin went to the wagon, got his revolver and started south, passing out of sight of the persons in the field. After Goodwin left the field, the witness, Sweeney, left his comrades and went to the western part of the field. He testified that Brown was riding a roan pony in a northwest direction; that Goodwin was on foot going southwest; that Brown stopped first, then Goodwin stopped; that they were about seventy-five or one hundred yards apart. About this time, witness stooped to pick up a fork, and while in a stooping position, he heard a shot fired, but did not know who fired it; he then heard a second shot fired, but did not know who fired it. The first shot sounded to him like a gun, and the second didn't sound as loud as the first. After the second shot was fired, he saw Brown dismount and fire a shot across his pony toward Goodwin. He noticed after this shot that Goodwin mashed down a little to the ground, and soon started toward his house, which was distant about two hundred and fifty yards. Brown mounted his horse and went to his wife and step-son not far off, and then turned his horse about a little northwest, and rode down near where Goodwin was getting into the road, and the last witness saw of them they were not over forty yards apart, both going in a northeast direction. While out of sight of witness, he heard another shot in their direction. The witnesses Sprouse and House testified that they heard the three shots fired, but did not see who fired them; that when they came in sight of the parties, Brown was riding toward his wife and boy, and Goodwin was walking toward his house; that Brown then turned his horse and rode near the path of Goodwin; the latter checked up, and Brown stopped at the same time and fired at Good-

win. This was the fourth shot they heard. Goodwin soon sank down and died. These two witnesses reached him before his death; his revolver was in his hand, and upon being interrogated by House, "Why he permitted himself to be shot up so?" replied, "My pistol snapped." Mrs. Brown, the wife of the defendant, testified that when Goodwin crossed the track of Brown he drew his revolver in front and fired three times — twice before Brown got off his pony, and once just as Brown fired; that she was in plain sight of both parties, being fifteen or twenty yards behind Brown, and Goodwin being fifty or sixty yards distant from him; that after this shooting, Brown came to her, and Goodwin started home. Brown said to her, "I believe I am shot through the thigh," and she said, "Let's go to pa's" (meaning his father's), which was about three-quarters of a mile away. They started for Brown's father's, and as Goodwin got up near the fence, in the road they were traveling, he stopped and turned from the way he was going and fired, and Brown fired again. The evidence of Meadows corroborated the statements of his mother, Mrs. Brown, to the effect that Goodwin fired the first two shots and Brown the third, and that at the second encounter Goodwin raised his hand, and two shots were fired about the same time. Both say Brown was slightly injured in the leg by one of the shots of Goodwin. The testimony shows that Brown had no other fire-arm except the double-barreled shot-gun, and that he did not load it at any time during the fray. The revolver of Goodwin was examined after his death: four chambers were empty — two loaded, but no caps on. Some of the witnesses thought only one load had been discharged recently, as the other chambers were rusty; others thought two loads had been lately discharged.

From this brief *résumé* of the testimony, some of which is conflicting, it is evident that the question whether the defendant or the deceased commenced the encounter is in doubt — at least, the evidence upon the point is very contradictory. The theory of the defense on the trial was, that Goodwin sought the first meeting and began the combat, firing two or

three times, and that he commenced the second encounter by firing upon Brown as he was on his way to his father's to have his injuries attended to.   As the acts of the deceased in reference to the two meetings are of a doubtful character, considering all the evidence, within the rule stated the uncommunicated threats were admissible.

Again, the rejection of these threats was error, as evidence of communicated threats had already been admitted, and in such cases it is competent for the purpose of corroborating this testimony to introduce evidence of uncommunicated threats. (*Cornelius v. Commonwealth*, 15 B. Mon. 539; *Holler v. State*, 37 Ind. 57.)   What effect the jury should give to the proof of these threats would depend upon their opinion of the entire facts and circumstances.   They should be particularly instructed, that previous threats, no matter of what character, would not of themselves justify the defendant in killing the deceased ; that the uncommunicated threats are admissible to show the *animus* of the deceased, to illustrate his conduct and motives, and in case of doubt as to the acts of the parties at their two encounters, as tending to show which one began or provoked the shooting ; and if communicated threats shall again be given in evidence, the jury may consider the uncommunicated threats as tending to corroborate this testimony.

The only other assignment of error that we care to notice is the misconduct of the bailiff, who entered the jury room while they were engaged in deliberating upon their verdict, and read the jury a portion of the instructions of the court. The affidavit of this officer, that he read these instructions at the request of the jury because they were unable to read them, does not excuse or justify his conduct.   His acts were in direct violation of his oath of office.   He was sworn not to permit any person to speak or communicate with the jury, nor to do so himself, unless by order of the court, or to ask them whether they had agreed upon their verdict.   As he violated his oath in reading the instructions, how can we say his testi-

*(margin note: 2. Uncommunicated threats of deceased, when admissible.)*

mony, that he read the instructions correctly, is to be believed? He is not under the circumstances a credible witness. We cannot say whether the rights of the defendant were prejudiced or not by this action. The officer deserves punishment by the court; and any verdict returned after such procedure on the part of a jury and bailiff ought to be set aside, as soon as the fact comes to the knowledge of the court. The general rule is, that if the court can see that the misconduct complained of, had or might have had in a criminal action an effect unfavorable to a defendant moving for a new trial, the verdict should be set aside.

*3. Jury; misconduct of bailiff; judgment reversed.*

We repeat what we said in the case of the *State v. Snyder*, 20 Kas. 306: "We cannot be too strict in guarding trials by jury from improper influences, and in compelling a rigid and vigilant observance of all the provisions of the statutes tending to preserve the purity of such trials." If no error had been committed in the rejection of testimony, we would have been compelled to have set aside the judgment and sentence of the court on account of the conduct of the bailiff and jury.

It is therefore ordered, that the verdict of the jury and the sentence and judgment of the court be annulled and avoided, and the case remanded for a new trial. It is further directed, that the appellant be returned from the state penitentiary and delivered over to the jailer of Chautauqua county, there to abide the order of the district court of said county.

VALENTINE, J., concurring.

BREWER, J., dissenting.