## STATE vs.. MARY A. POWELL.

*Criminal Law—Homicide—Murder—Malice—Self-Defense—Con-
fessions — Adulterous Conduct of Deceased with Prisoner's
Husband—No Justification for Killing the Deceased—
Evidence — Photographs of Body of Deceased—
Threats of Deceased Not Communicated to
Prisoner—Credibility of Witness—
Character Evidence.*

1. In a trial for murder, photographs of the body of the deceased offered by the State for the purpose of showing the condition of the body in respect to the size and location of the wounds inflicted, are admissible in evidence. The fact that the defendant admits the location and character of the wounds does not make the photographs immaterial.

2. In such a trial where the plea of self-defense is relied upon the defendant may show prior threats made by the deceased against the defendant although they were not communicated to the defendant. It may also be shown that the deceased requested the witness to say nothing about the threats to anybody.

3. The prior conviction of a witness for carrying concealed a deadly weapon will not be admitted to affect the credibility of the witness.

4. Murder of the first degree, murder of the second degree and manslaughter, defined. The law respecting malice and self-defense, stated.

5. Wherever the fatal act is done deliberately, or without adequate cause, the law presumes that it was done with malice, and the burden is on the prisoner to show from the evidence, or by inference from the circumstances of the case, that the act was not done with malice. All homicides with a deadly weapon are presumed to be malicious until the contrary appears by the evidence, and the burden of proof to the contrary lies upon the accused.

6. If the jury are satisfied from the evidence that the deceased first attacked the prisoner, and that from the character of such attack the prisoner had reasonable cause to believe, and did believe, that he was in imminent danger of death or great bodily harm, and that he had no other reasonable means of avoiding or preventing death, or great bodily harm, then the killing of the deceased was a justifiable act of self defense, and the prisoner should be acquitted of any crime whatever.

7. Where the prisoner admits the killing, but seeks to excuse or justify the act on the ground of self-defense, and there is doubt as to who began the combat, the jury may take into consideration threats made by the deceased, as well as prior threats made by the prisoner, if such be proved, as tending to show which of them was the aggressor.

8. No suspicion, belief or knowledge that adulterous intercourse had previously existed between the deceased and the prisoner's husband can have the effect of excusing or justifying the killing of the deceased. If the prisoner deliberately killed the deceased under the impulse of anger, jealousy, hatred or revenge, created or incited by the belief or knowledge of such previous adultery, such killing was not only without adequate provocation, but was also wilful and malicious, and constituted the crime of murder.

9. A free and voluntary confession is generally deserving of the highest credit, because it is against the interest of the person making it, and is presumed to flow from a sense of guilt. The whole of the confession should be taken and considered by the jury, but all parts of it are not necessarily entitled to equal credit. The duty of the jury in respect to the confession of the prisoner, and in respect to the prisoner's own testimony, and the testimony of the other witnesses is precisely the same ; they should believe so much of such confession and testimony as they deem true and worthy of belief, and reject so much of the same as they deem false and unworthy of belief.

10. The good character of an accused person, when proved, is to be taken in connection with all the other evidence in the case, and is to be given just such weight under all the facts and circumstances of the case as in the judgment of the jury it is entitled to.

(*May 7, 1904.*)

JUDGES SPRUANCE, GRUBB and BOYCE, sitting.

*Herbert H. Ward,* Attorney-General, and *Robert H. Richards,* Deputy Attorney-General, for the State.

*Henry Ridgely* and *Frank H. Davis* for the prisoner.

At a Court of Oyer and Terminer for Kent County, beginning the second day of May, 1904, Mary A. Powell, a married woman, was tried for murder of the first degree for the slaying of

one Estella Albin, at the home of the prisoner near Bowers' Beach in said county, on the ninth day of February, 1904.

At the trial, the State offered in evidence certain photographs of the body of Estella Albin, taken on the twelfth day of February, purporting to show the wounds made upon the same by the prisoner; having first proved by the photographer who made the photographs that they truly and correctly represented the condition of the body at the time, and having further proved by a witness who saw the body immediately after the discovery of the murdered girl and also by other witnesses who saw the body on the tenth day of February, that the photographs correctly represented the condition of the body at those times.

*Ridgely*, on behalf of the prisoner, objected to the admission of the photographs on the grounds stated in the following opinion of the Court overruling the objections and admitting the photographs in evidence:

SPRUANCE, J.:—There are two objections urged to the admission of these photographs in evidence; first, that they do not represent the condition of the body at the time of the death. We are satisfied, upon that point, that the evidence is sufficient—so far as the location and size of the larger wounds is concerned—to show that the condition of the body at or shortly after the death was substantially the same as appears from the photographs.

The second objection is that as the defendant admits the location and character of the wounds, there is no issue raised upon that point and that the photographs are immaterial. But we would remind the counsel for the defendant that the location and character of the wounds are material allegations in the indictment; and it is the duty of the State to prove them, and it cannot be limited by counsel on the other side as to the mode of proving them. It may prove them by any proper method that it sees fit to employ and it

cannot be deprived of that right by the admissions of the defendant as to their location or character. The learned counsel for the defendant says that these photographs will have the effect of inflaming the passions or emotions of the jury. The Attorney-General disclaims any such purpose, and such disclaimer would not have been necessary at all, since he does state a proper ground upon which he asks them to be admitted. We hope the jury will deal with this case upon the facts, without any emotion or passion of any sort. We are clearly of the opinion that these photographs should be admitted at this time, and they are admitted.

(The following confessions of the prisoner, made to State Detective James P. Ratledge, and taken down by the latter in writing, and afterwards read over to the prisoner in the presence of two or more witnesses and acknowledged by her to be a true and voluntary statement on her part, were admitted in evidence):

First Confession of Mary A. Powell. (Made February 1st, 1904).

" On Tuesday, February 9th, 1904, about 9.30 a. m., I put my dinner pot on, put the meat in it and then I picked up some empty catsup bottles and glass fruit cans and taken them up in the garret, and Essie Albin came up there. I asked her what she wanted and she grumbled out something I could not understand, and she looked so ill and as if she would do something to me if she had a chance, and I hit her three times with a catsup bottle. The first time I hit her on the right side just above the ear and she turned around and I hit her on the left side and then she went down kind of on her knees and then I hit her on the back of the head. She then fell over on her face and I caught her by the shoulder. Then I taken that knife out of my pocket. I had it to rip some of my sewing, was how I came to have it in my pocket. I then cut her throat. I did not cut her any other place intentionally. All the cuts she had on her hands and arms was done by

her trying to keep me from cutting her throat. I don't know how she was cut just above the forehead in the edge of her hair. I might have struck her there but I don't remember, I was so mad and excited. I can't remember just how many times I did hit her.

"Mr. Ratledge, I was drove to this by my husband mistreating me over Essie. I have seen him hugging and kissing her several different times. I have caught them in the water closet together. He was having sexual intercourse with her. And also upstairs with her on the floor doing the same, and lots of other times and places.

"MARY A. POWELL."

Further Confession of Mrs. Mary A. Powell. (February 16th, 1904, 6.45 a. m.)

"After I cut her throat she turned over on her right side and I thought she was about gone, and I stuck the knife in her right hand. I then went on down stairs and left her. My apron was awful bloody and I burned it in the cook stove downstairs. The blood I got on my dress I just took a little wet rag and wiped it off. The blood on my undershirt sleeve which you have there is her blood. I did not know it was there, it soaked through my sleeve. I wiped the blood off of my dress sleeve with a wet rag.

"MARY A. POWELL."

Further statement of Mary A. Powell, made at 10.30 a. m. on Tuesday, the 16th day of February, 1904.

"Mr. Ratledge has read over in the presence of T. W. Francis and H. H. Ward, Attorney-General, the two statements made to Mr. Ratledge which I have signed. These two statements were made by me voluntarily without any promises or threats or inducements made by any person to me. I again say in the presence of such persons that my statement is true. That I have been warned by the Attorney-General before making this additional statement that my confession will be used against me at my trial. I make

this further statement voluntarily and willingly and without any promise of any kind being made to me by anybody and without any threats made to me by anybody.

"Mary A. Powell."

The prisoner, when placed upon the stand in her own defense, made the following statement to the jury concerning the facts immediately connected with the tragedy:

" I heard the garret door open and I seen a form of a person coming up the steps. While I was stooping to put down my bottles I looked around, after I heard the door open, and I seen the form of the person coming; then I still kept looking to see who it should be, and it was Essie.

"I was putting the cans down and was in this position (witness indicates a stooping position); right along there—you might say this was the garret. I heard some person coming up the steps, and I looked around just that very way (witness turns the head to the right, still being in a stooped position) ; and I heard the door open and it attracted my attention and I looked around and I seen her coming up the first flight of steps. When she got up on the platform I said to her, ' What do you want ? '—I still was stooping down—and she muttered out something, I could not understand what she said. Well, she rushed up the next flight of steps, and I raised up to see her, and she rushed right up to me.

" Now you catch hold of me, and I will show you ( Mr. Davis approaches the witness, who illustrates as follows ): She had this hand ( indicating the right hand ) thrown back that way over her shoulder as if she was going to hit me with something, and she grabbed me in the throat here and was choking me so bad that I did not know what to make of her. She seized me, and I had this catsup bottle in my hand, and I struck her right on that side of the head, and as I hit her right on the right side of the head ; well, she held me so tight in the throat here that I could not break her hold and I just seen she was going to choke me so badly and I seen that she was trying to take me down on the floor,

and I hit her again with the bottle on the left side ; so she still had me by the throat and choking me so bad she was pretty near stopping my wind off ; when I hit her the second time, she went down, and pulled me down with her.

" We were both down on the floor together, and she choked me so bad there that she was stopping my wind and I could not do anything, could not get rid of her. I tried to break her hold, then I hit her in the back of the head and she went over on her face a little bit, and then I thought that I had hurt her bad enough to get rid of her and I would get away from her and before I could get my skirt from under hers and get up and away from her she grabbed me in the throat and said she was going to choke me to death. I had let go of my bottle and I had nothing to defend myself with and what should I do? And so she was still continuing to choke me and I did not have anything to defend myself with and what should I do? And so she was still continuing to choke me and I did not have anything to defend myself with, and she tried to take the use of my left hand. She knew my right hand was sore, that I had bruised it with the scissors. So then we were down there in the floor some time. She took her apron off on the floor. She had the apron there and it was left there as the witnesses saw. She tried to stick it in my mouth, and tried to stop my breath, and she tried to choke me. So I could not do nothing with her. I could not get rid of her. So I had a knife in my pocket that I had put in there the day before to rip my sewing. So after a long while I thought of my knife. I felt around in my pocket and I got my knife, and so then after I got my knife out I made out to get it open some way or another, I hardly know how.

" So after I got the knife out of my pocket and. managed to get it open, she tried to get the knife from me. Well, I did not know what to do with it, so after I got it open she tried to take the knife from me. It was in my sore hand, and she would wrench on my fingers. She would pry them this way (indicating), and I just knew that if she got that knife she would take my life

with that knife, because she had said that she was going to choke me to death, she was going to take my life. I did not know what I could do with her. I was down there, and she trying to stop my breath with her apron, and she tried to hold my hand down with her knee and to take the knife out of this hand. So I could not do nothing with her. I did not want to cut the girl; I did not want to do that. So she fought me for quite awhile. We were down there on the floor fighting, and I was trying to prevent her from getting the knife. I just seen she was going to get my knife, and I was not able to shut that hand up tight. Gentlemen, look at it (witness holds out her hand) where she pulled it to straighten it out. See, it won't go down now. I cannot shut it up tight. And so then, after our fight over the knife she kept on trying to choke me and tried to smother me with the apron, putting it all over my face, and I was at the same time trying to get away from her; and she kept fighting me for the knife, and I just seen that she was going to kill me with that knife. So I shifted it over in this hand, and while I was getting it over in this hand she liked to have got it, and I knew if 1 dropped it then she would get it, and she held my hand so that I could not throw the knife away, and I could do nothing else only to cut her with it. I did not want to cut her, but I was compelled to cut her to save my own life.

"And so after I cut her, I pushed her over off me and I crawled up the best way I could after awhile, and then I did not know what in the world to do. I looked at my dress. I was bloody pretty near all over. What in the world will I do, I thought. My husband, if he knows we have done such things as this he will kill me. Well, I had no other dress. I had worn this one all winter and I knew that if I taken it off I would catch cold, and so what should I do, and I could not imagine what I should do with my dress. Well, when I got up I staggered around the room. I could not hardly navigate. She had choked me so bad, I staggered up against the door and that is how the blood got on the door. My hair was all down, hair pins all gone; and so then after I got to

feel a little better I sat down a little while and after I got to feel a little better I got my hair fixed some how or other, pinned my hair up, and in the meantime she rolled over on her right side. And something said to me. 'Put the knife in her hand; and it will look like a suicide.' I put the knife in her hand, and when I felt as if I could go down without falling on my head, I went down stairs and into the open air, and I got a little water and a rag, and washed my dress off the best I could, wiped it off, and washed my face. I was a living sight over my face and my hands. And so when I went out and got my dress washed off and all, I sat down and rested. Then I had to fix Uncle Pat and the little boy a little dinner; and I did no more the balance of the day."

*Bessie Kenney*, a witness for the defendant, having testified that she was visiting the Powell farm during Christmas week preceding the murder and saw Estella Albin there, was asked by defendant's counsel the following questions :

Q. Did she make any statement to you ?

A. Yes, sir.

Q. What was it ?

(Objected to by the Attorney-General as hearsay testimony ; that Estella Albin being dead it was impossible for her to deny it and it was therefore improper testimony.)

SPRUANCE, J. :—Mr. Ridgely, do you engage to show that before this killing this statement of Estella Albin was communicated to Mrs. Powell by this witness or by anybody ?

*Mr. Ridgely:*—No, sir. We propose to show that the truth of the statement made by Mrs. Powell as to the fact that there was poison in the coffee and put there by Estella Albin, was admitted by Estella Albin to this witness; so that Mrs. Powell's statement as to what she believed would not be left as mere conjecture, but would be proven to be a fact.

In a trial for homicide, prior threats made by the deceased but not communicated to the accused are not generally admissible

in evidence; but in such a case where the accused admits the killing but seeks to excuse his act on the ground of self-defense, and the question as to whether the deceased or the accused was the aggressor is in doubt, then such uncommunicated threats are admissible not as tending to prove that the accused was in imminent danger at the time of the fight, but as tending to show that the deceased may have been the aggressor.

The reason that threats made by the accused are admissible is as going to establish the fact that he probably began the affray. Precisely the same reason would hold for admitting threats of the deceased as tending to establish the fact that he and not the accused was the aggressor. Of course if there is no question or doubt that the accused began the affray, then prior threats of the deceased are certainly not admissible; but where there is doubt on this head, then they are admissible.

*Wiggins vs. People, etc., 93 U. S., 465 (466); Stokes vs. People, 53 N. Y., 164 (174); Keener vs. State, 18 Georgia, 194 (224); Miller vs. Commonwealth, 89 Ky., 653 (655-657); State vs. Brown, 22 Kan., 222 (226-227); People vs. Palmer, 96 Mich., 580 (582); Wilson vs. State, 30 Fla., 234 (242-243); State vs. Tarter, 26 Oreg., 38 (41-42); Little vs. State, 6 Baxt. Tenn., 491 (Notes 494-495); Johnson vs. State, 66 Miss., 189 (191); Holler vs. State, 37 Ind., 57; Johnson vs. State, 54 Miss., 430 (432); Binfield vs. State, 15 Neb., (487-488); Campbell vs. People, 16 Ill., 17; People vs. Arnold, 15 Cal., 476; People vs. Scoggins, 37 Cal., 676; People vs. Travis, 56 Cal., 251; People vs. Alivtre, 55 Cal., 263; Hart vs. Commonwealth, 85 Ky., 77; State vs. Helm, 61 N. W., 246; Myers vs. State, 62 Ala., 599; People vs. Thompson, 92 Cal., 506 (511); Roberts vs. State, 68 Ala., 156 (163); State vs. Evans, 33 W. Va., 417 (425); American & English Encyclopedia of Law 2 Ed. Volume 25, Note H, Top of Page 281.*

*Ward* and *Richards*, for the State, replied.

SPRUANCE, J. :—We think the form of the question is too general. There is not any subject at all indicated as to which she

made a statement.  It might be what she said about a horse race or about some other subject utterly foreign to the matter now under consideration.

(Form of question changed as follows ) :

Q.  At the time in question, did or did not Estella Albin make any threats to you against Mrs. Powell ?

A.  Yes.

Q.  What were they ?

A.  She said that she put something in the coffee pot that morning and she was going to kill Mrs. Powell if she had to kill the whole family.

Q.  Did Estella Albin make any request of you as to this statement or threat?

(Objected to by the Attorney-General as not pertinent or admissible.  Objection overruled).

A.  Yes, sir.

Q.  What was that request ?

A.  She told me not to say anything about it ; not to tell anybody.

Counsel for the prisoner offered to prove by James V. McCommons, Clerk of the Peace for Kent County, a certain entry on the docket of the Court of General Sessions showing the conviction, in 1888, of one of the State's witnesses upon a charge of carrying concealed a deadly weapon, as affecting his credibility as a witness in the present case.  This was objected to by the Attorney-General as immaterial.

SPRUANCE, J. :—Upon an inspection of this entry sought to be offered in evidence, we do not see how it is admissible in this case to affect the credibility of the witness.

Dr. James H. Wilson, a witness for the State testified that he made a post-mortem examination, assisted by other physicians, of

the body of Estella Albin on February 12th, 1904; that his examination disclosed 170 contused and incised wounds upon the back of the head, scalp, face, throat, arms, hands, back, and left leg; the most severe wounds being described by the witness as follows:

" Six irregular linear shaped cuts varying in length from 2 to 4 inches immediately over the incision that severed the large arteries, and at the upper border of the throat.

" A series of linear shaped incisions in the throat immediately below the main incision that severed the main arteries, veins and nerves extending from angle of left lower jaw to middle of throat, that is, to median line, in a line perpendicular to the chin, that is to point of chin, making a denuded surface, being in a hacking condition, but passing through skin and superficial facia.

" One superficial cut to the right and downward from median line of neck 2 inches in length, terminating just above the clavicle —the collar bone—but not passing through the skin.

" Below the main cut mentioned above that severed wind-pipe, blood vessels and nerves, on the right side of neck are as many as ten gashes, making an irregular hacking, each gash being linear in shape and in the main parallel with the cut above mentioned, and likewise terminating with the main cut, below the ear on right side of neck.

" *Main Cut of Throat.* Extending from angle of right to angle of left lower maxiliary bone, that is, the incision began and terminated just above each of the points named. The incision is 7 inches in length severing the windpipe, jugular veins and both carotid arteries and all the tissues exposing the anterior surface of the spinal vertebræ (cervical), that is, the outer surface of the spine; that is what we call the anterior surface in contradistinction of the back of the spine. It was cut through here exposing the front part of the spinal column, and all of these vessels were cut here leaving an unobstructed view of the vertebræ of this part of the neck—that is, the front part.

"Below the last named incision is irregular hacking of surface, immediately over the trachea, that succeeded in severing the anterior —the outer—walls of trachea separating the 3 upper cartilaginous rings and the hyoid bone and the cricoid cartilage."

### PRAYERS ON BEHALF OF THE DEFENDANT.

*First.*   Proof of any deceit, artifice or misrepresentation by the defendant after the homicide must be received by the jury with caution as evidencing any guilt on the part of the accused.

*Roscoe Criminal Evidence, Volume 2, star page 732, top paging 943 of the Eighth Edition.*

*Second.*   If the accused killed the deceased at a time when she was in imminent danger of death or great bodily harm, the jury must find her not guilty.

*Third.*   That the question for the jury is not whether they believe that the prisoner was at the time in imminent danger of death or great bodily harm, but simply whether they believe that the prisoner had good cause to believe and did believe at the time that she was in such danger.

*McClain Criminal Law, Volume 1, Section 304, et seq. ; Wharton's Criminal Law, Volume 1, Section 488, et seq.*

*Fourth.*   That where, on a trial for homicide, the prisoner sets up self-defense, and the jury are in doubt as to whether the accused or deceased was the aggressor, that then the jury are to take into consideration the threats made by the deceased as tending to show that the deceased was the aggressor.

*Fifth.*   That in trials for homicide where self-defense is pleaded by the prisoner, and there is doubt as to who began the combat, the jury are to take into consideration the motive of the deceased as well as the motive of the accused for wishing to engage in a conflict with the accused, as tending to show that the deceased was the probable aggressor.

Cases heretofore cited on same point.

*Sixth.*  That the prisoner is entitled to the benefit of any doubt in the minds of the jury, and if they have any doubt as to the guilt of the prisoner, they must find a verdict of not guilty.

*Seventh.*  That the use of a deadly weapon by the accused in a sudden affray with the deceased where the accused is not the aggressor, is not a fact from which malice may be implied, if the jury shall believe that such deadly weapon was not selected by the accused with deliberation.

SPRUANCE, J., charging the jury :

Gentlemen of the jury :—The prisoner, Mary A. Powell, is indicted for the murder of Estella Albin on the ninth day of February last.

The prisoner admits that she took the life of said Estella Albin, but insists that she did so in necessary defense of her own life against a deadly assault upon her by the said deceased.

Homicide is the killing of one human being by another. Felonious homicide is of three kinds : murder of the first degree, murder of the second degree and manslaughter.  Malice is an essential ingredient of the crime of murder of both degrees.  Without malice there can be no murder either of the first or of the second degree.  Malice is a condition of the mind or heart.  As here used this term is not restricted to spite or malevolence toward the particular person slain, but also includes that general malignity and reckless disregard of human life which proceed from a heart void of a just sense of social duty and fatally bent on mischief. Wherever the fatal act is done deliberately or without adequate cause, the law presumes that it was done with malice, and the burden is on the prisoner to show from the evidence, or by inference from the circumstances of the case, that the act was not done with malice.

Murder of the first degree is where the killing was done with

express malice aforethought, or in perpetrating or attempting to perpetrate a crime punishable with death. Express malice aforethought is where one person kills another with a sedate deliberate mind and formed design, which formed design may be manifested in many ways; as, for instance, by lying in wait for the deceased, or by antecedent menaces or threats that disclose a purpose on the part of the prisoner to commit the act charged, or by a former grudge, ill-will, spite, hatred, or malevolence towards the deceased, or any other circumstances which disclose the purpose or intention of the accused toward her victim at the time when the crime was committed. The deliberate selection and use of a deadly weapon is a circumstance which, in the absence of satisfactory evidence to the contrary, indicates the existence in the mind of the person committing the act of a deliberate formed design to kill. All homicides with a deadly weapon are presumed to be malicious until the contrary appears by the evidence, and the burden of proof to the contrary lies on the accused. Where the killing by a deadly weapon is admitted or proved, malice aforethought is presumed, in the absence of evidence to the contrary, and the burden of showing the contrary is on the accused, as the natural and probable consequences of the act are presumed by the law to have been intended by the person in using a deadly weapon. If the jury are satisfied from the evidence that the prisoner, when she killed the deceased, deliberately intended so to do, the length of time that said intention existed is immaterial, and the killing under such circumstances would be murder.

Murder in the second degree is where the killing was done with implied malice. Implied malice is an inference or conclusion of law from the facts found by the jury. Murder of the second degree is where there was no deliberate mind or formed design to take life or to perpetrate a crime punishable with death, but where the killing was done without justification or excuse and without provocation, or without sufficient provocation to reduce the offense to manslaughter.

CHARGE.

Manslaughter is where one person unlawfully kills another without malice. In order to reduce the crime to manslaughter, the provocation must be very great—so great as to produce such a transport of passion as to render the person for the time being deaf to the voice of reason. While murder proceeds from a wicked and depraved spirit and is characterized by malice, manslaughter results from no malignity, but from unpremeditated and unreflecting passion.

No looks or gestures, however insulting, no words, however opprobrious or offensive, can amount to a provocation sufficient to excuse or justify even a slight assault. Nor can a slight assault excuse the killing of an assailant with a deadly weapon, so as to reduce the offense from the grade of murder to that of manslaughter.

The burden of establishing self-defense to the satisfaction of the jury rests upon the prisoner. In repelling or resisting an assault, no more force may be used than is necessary for the purpose, and, if the person assailed use in his defense greater force than is necessary for that purpose, he becomes the aggressor. If the deceased first attacked the prisoner, even though the attack was of such a character as to create in the mind of the prisoner a reasonable belief that she was in danger of death or great bodily harm, it was her duty to retreat, if she could safely do so, or to use such other reasonable means as were within her power to avoid killing her assailant. No one may take the life of another, even in the exercise of the right of self-defense, unless there is no other available means of escape from death or great bodily harm. If the jury are satisfied from the evidence that the deceased first attacked the prisoner, and that from the character of such attack the prisoner had reasonable cause to believe, and did believe, that she was in imminent danger of death or great bodily harm, and that she had no other reasonable means of avoiding or preventing death or great bodily harm, then the killing of the deceased was a justifiable act of self-defense, and the prisoner should be acquitted of any crime whatever.

Where the prisoner admits the killing, but seeks to excuse or justify the act on the ground of self-defense, and there is doubt as to who began the combat, the jury may take into consideration threats made by the deceased, as well as prior threats made by the prisoner, if such be proved, as tending to show which of them was the aggressor. If you shall be satisfied from the evidence that the prisoner killed the deceased unlawfully, your next duty will be to determine the grade of the offense in accordance with the instructions given you by the Court. In the discharge of that duty you should not be swayed or influenced by any consideration of the punishment which may follow a conviction. It is your duty to determine and declare whether the prisoner under this indictment is guilty of any, and, if of any, of what, offense; and there your duty ends.

It appears from the evidence on behalf of both the State and the prisoner that an adulterous intercourse between the prisoner's husband and the deceased had been carried on for some time prior to the killing, and that this was known to the prisoner, and that she had on several occasions been a witness of such conduct. We charge you, that no suspicion, however vehement, no belief, however well founded, no knowledge, however positive and absolute, that adulterous intercourse had previously existed between the deceased and the prisoner's husband, can have the effect of excusing or justifying the killing of the deceased, or of mitigating or reducing the crime below the grade of murder, If the prisoner deliberately killed the deceased under the impulse of anger, jealousy, hatred or revenge, created or incited by her belief or knowledge of such previous adultery, such killing was not only without adequate provocation, but was also wilful and malicious, and constituted the crime of murder.

A free and voluntary confession is generally deserving of the highest credit, because it is against the interest of the person making it, and is presumed to flow from a sense of guilt. The whole of what the prisoner said on the subject, at the time of making the

confession, should be taken together and considered by the jury; but all parts of a confession, whether for or against the prisoner, are not necessarily entitled to equal credit. The prosecution is at liberty to deny or contradict any part of it. In determining the credit to be given to a confession, the jury may reject, as not entitled to belief, such parts of it as are contradictory to other parts of it, or in conflict with facts otherwise proved to the satisfaction of the jury. The jury may believe that part of the confession which charges the prisoner, and reject that which is in her favor, if, under all the circumstances of the case, they find sufficient grounds for so doing. The duty of the jury in respect to the confessions of the prisoner and in respect to her own testimony and the testimony of the other witnesses is precisely the same. They should believe so much of such confessions and testimony as they deem true and worthy of belief, and reject so much of the same as they deem false and unworthy of belief.

The good character of an accused person, when proved, is to be taken in connection with all the other evidence in the case, and is to be given just such weight, under all the facts and circumstances of the case, as in the judgment of the jury it is entitled to.

In every criminal case the accused is presumed to be innocent until his guilt is proved to the satisfaction of the jury beyond a reasonable doubt. If, after carefully and conscientiously considering and weighing all the evidence in the case, you should entertain a reasonable doubt of the guilt of the prisoner, that doubt must inure to her benefit, and your verdict should be "not guilty." But, such a doubt must not be a mere fanciful, vague, or speculative doubt, but a reasonable, substantial doubt, remaining in your minds after a careful consideration of all the evidence, and such a doubt as reasonable, fair-minded, and conscientious men would entertain under all the facts and circumstances of the case.

Under this indictment, if the evidence shall so warrant you, you may find the prisoner guilty in manner and form as she stands indicted—that is, guilty of murder in the first degree—or guilty of murder in the second degree, or guilty of manslaughter, or not guilty.

Verdict, guilty of murder in the second degree.